Caitlin SJÖSTRAND, Plaintif–
Appellant,

v.

The OHIO STATE UNIVERSITY,
Defendant–Appellee.

No. 13–3449.

United States Court of Appeals,
Sixth Circuit.

Argued: Nov. 19, 2013.

Decided and Filed: April 28, 2014.

ARGUED: Laren E. Knoll, The Knoll Law Firm, Dublin, Ohio, for Appellant. Mia Meucci Yaniko, Office of the Ohio Attorney General, Columbus, Ohio, for Appellee. ON BRIEF: Laren E. Knoll, The Knoll Law Firm, Dublin, Ohio, for Appellant. Mia Meucci Yaniko, Office of the Ohio Attorney General, Columbus, Ohio, for Appellee.

Before: DAUGHTREY, KETHLEDGE, and DONALD, Circuit Judges.

KETHLEDGE, J., delivered the opinion of the court, in which DONALD, J., joined,

and DAUGHTREY, J., joined in part. DAUGHTREY, J. (pp. 602–07), delivered a separate opinion concurring in part and dissenting in part.

**OPINION**

KETHLEDGE, Circuit Judge.

Caitlin Sjöstrand graduated magna cum laude from the Ohio State University (Newark campus) in only two and a half years. Then she applied to Ohio State's Ph.D program in School Psychology, where her grade-point average (3.87) was tied for highest in the applicant pool and her GRE scores (a combined 1110) exceeded the school's requirements. But Sjöstrand also suffers from Crohn's disease; and according to Sjöstrand, her interviews with two of the program's professors focused more on her ailment than they did on anything else. Eventually, of the seven applicants interviewed by the school, the only applicant rejected was Sjöstrand.

Sjöstrand thereafter sued OSU under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, claiming that the school had rejected her application "by reason of" her disability. OSU moved for summary judgment, which the district court granted on the ground that Sjöstrand lacked evidence that would allow a jury to find the school had rejected her because of her Crohn's. We disagree and reverse.

**I.**

In connection with her application to OSU's School Psychology program, Sjöstrand was separately interviewed by two professors from the program: Professor Laurice Joseph, the program's head, and Kisha Radliff, an assistant professor in the program. According to Sjöstrand—whose testimony at this stage of the case we take as true—each interviewer spent about half the interview discussing Sjöstrand's Crohn's disease with her.

Sjöstrand thereafter received a letter from an OSU admissions officer, Nance Hoza, informing Sjöstrand that her application had been rejected. The letter did not offer any reason for the denial, so Sjöstrand called Hoza to ask what the reason was. Hoza said she did not know, and referred Sjöstrand to another admissions officer, Tim Graham. Sjöstrand called Graham and asked why she had been denied admission. Although Graham likewise lacked personal knowledge about Sjöstrand's application, he pulled her file and said that the only information available was that she did "not fit the program."

Sjöstrand then attempted to call Joseph, leaving her two voicemails. It took Joseph two weeks to call Sjöstrand back, and when she did Joseph was vague and evasive. In particular, when Sjöstrand asked what she could do to be a better "fit" for the program—which was the reason flagged by Graham for her rejection—Joseph had little or nothing to say.

But six days later, in an email to another professor, Donna Pastore, Joseph recited five putative reasons why the program had rejected Sjöstrand. Pastore then prepared a draft letter to Sjöstrand that recited three of those reasons as the basis for her rejection. Eventually the reasons were cut to one—that "[t]he committee felt your interests and motivation were a better match for counseling rather than school psychology"—and the letter was sent to Sjöstrand.

Sjöstrand thereafter sued OSU under Title II of the ADA and the Rehabilitation Act. After discovery, a magistrate judge granted OSU's motion for summary judgment. This appeal followed.

## II.

■ We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to Sjöstrand. *Lexicon, Inc. v. Safeco Ins. Co. of Am., Inc.,* 436 F.3d 662, 667 (6th Cir. 2006). Summary judgment is proper only when the record shows that there is no genuine issue as to any material fact. *Id.* "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 451 (6th Cir.2004).

### A.

Sjöstrand argues that OSU discriminated against her when it denied her application, in violation of Title II of the ADA. Title II provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As a state university, OSU is a public entity. *See Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 589, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999).

In the typical Title II case, the plaintiff alleges she was denied reasonable accommodations in violation of the Act. In this case, however, Sjöstrand alleges not that she was denied reasonable accommodations, but that the school discriminated against her—on the basis of her Crohn's disease—when it rejected her application. Discrimination claims normally arise under Title I of the ADA. *See* 42 U.S.C. § 12112 ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures"). Thus, Sjöstrand's claim looks more like the typical Title I claim than it does a Title II claim; and perhaps for that reason, the parties assume that the Title I burden-shifting regime for proving discrimination applies here. We make the same assumption for purposes of this appeal.

■ Under that burden-shifting regime, Sjöstrand must first establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If she does, OSU must then offer a legitimate, nondiscriminatory reason for its rejection of her application. *Id.* If OSU does so—and its burden is merely one of production, not persuasion—Sjöstrand must then present evidence allowing a jury to find that the university's explanation is a pretext for unlawful discrimination. *Id.* at 804, 93 S.Ct. 1817.

### 1.

■ The district court held that Sjöstrand failed to present evidence establishing a prima facie case of discrimination. To make out that case, Sjöstrand must present evidence showing first, that she is disabled; second, that she was "otherwise qualified" for the program; and third, that OSU rejected her application "by reason of" her disability. *See* 42 U.S.C. § 12132; *Kaltenberger v. Ohio Coll. of Podiatric Med.,* 162 F.3d 432, 435 (6th Cir.1998). OSU concedes that Sjöstrand has met the first two requirements, but disputes the third.

■ Sjöstrand cites three kinds of evidence as proof that OSU rejected her by reason of her disability. The first concerns her interviews. One can fairly read the testimony of OSU's own witnesses—Joseph, Radliff, and the only other professor in OSU's School Psychology program, Antoinette Miranda—to mean that one of the reasons to interview an applicant, if not the most important reason, is

to discuss any concerns with the student's application. Yet according to Sjöstrand's testimony—which of course a jury would be entitled to believe—neither of her interviewers even mentioned any of the putative reasons why her application was rejected, and each interviewer instead devoted about half the interview to a discussion of her Crohn's disease. The resulting inference is that the interviewers' real concern—and thus the reason they rejected Sjöstrand's application—was her Crohn's disease.

Second, a rational juror might find that inference bolstered by Joseph's behavior after the fact: by her failure to return Sjöstrand's call for two weeks, by Joseph's vague and evasive answers when she did finally call back, and by Joseph's production of no less than five putative reasons for Sjöstrand's rejection in an email six days after the call—an email that, given its disparity with Joseph's notably vague phone conversation with Sjöstrand herself, a jaded (but still reasonable) juror might regard as merely papering the file. OSU responds that Joseph was vague on the call with Sjöstrand only because Joseph did not have Sjöstrand's file in front of her then; but many jurors might regard that explanation as lame, given that Joseph took two weeks to return the call—meaning she could pick her moment to make it—and that Joseph obviously did have the file when she sent her email to Pastore six days later.

Third, Sjöstrand presented undisputed evidence that her grade point average was tied for the highest in the applicant pool; that her GRE scores easily met the program's minimum requirements; and that, more to the point, the program admitted another applicant whose grade point average was lower than Sjöstrand's, whose GRE score was below the school's putative minimum, and whose application included numerous rather obvious typographical errors (*e.g.*, "enrollement," "Specilization," "community")—but who did not, unlike Sjöstrand, have Crohn's disease. Sjöstrand's evidence was enough to establish her prima facie case.

2.

▮ OSU contends, and the district court found, that OSU articulated a legitimate, nondiscriminatory reason for the faculty's decision to reject Sjöstrand's application. OSU's obligation at this step "is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir.2009).

OSU offered an overarching reason for its rejection of Sjöstrand's application—that she was a better fit for the counseling program—with five more specific reasons in support. Those putative reasons all concerned Sjöstrand's responses on her written application. Specifically, the reasons were that (1) Sjöstrand identified as her preferred mentor a professor from the School Counseling program, Darcy Granello, rather than a professor from the School Psychology program, to which she had applied; (2) Sjöstrand expressed an interest in counseling adults, whereas the School Psychology program focuses on counseling children; (3) Sjöstrand failed to identify anything specific about the program's mission; (4) Sjöstrand had limited experience working with children; and (5) Sjöstrand had limited research experience. Professor Joseph, among others, testified about these reasons in her deposition. We agree with the district court that these reasons are sufficient to meet OSU's burden of production.

▮ That leaves the question whether Sjöstrand presented evidence that would allow a jury to find that these reasons—and thus OSU's overarching reason about

Sjöstrand's fit with the program—were pretextual. *See Russell v. Univ. of Toledo,* 537 F.3d 596, 604 (6th Cir.2008). And on this point we respectfully disagree with the magistrate judge. All of the program's putative reasons for its rejection of Sjöstrand's application are caught between the pincers of the testimony of OSU's own witnesses and the testimony of Sjöstrand herself. Specifically, as shown above, everyone in this case—and notably OSU's own witnesses, including Joseph—agrees that at least one purpose of interviewing an applicant is to discuss the program's concerns about her application. And yet, on the record as it comes to us here, neither Joseph nor Radliff asked any questions—not a single one—about any of the five putative reasons for Sjöstrand's rejection. That omission is important evidence that these putative reasons were actually pretextual ones, and that the real reason for Sjöstrand's rejection was the one that Joseph and Radliff discussed at length in Sjöstrand's interviews: her Crohn's disease.

Sjöstrand also presented evidence specific to each of the five reasons. First, it is certainly true, as OSU points out, that Sjöstrand identified Professor Granello as her preferred mentor, and that Granello was a member of the Counseling program. But another applicant—the same one whose GRE scores were much lower than Sjöstrand's, and whose application contained typographical errors—failed to identify a preferred mentor at all, and yet was admitted. So a jury might be skeptical of this reason.

Second, although it is technically true that Sjöstrand expressed an interest in counseling adults, the inference that OSU asks us to draw from that fact—that counseling adults, rather than children, was Sjöstrand's primary area of professional interest—is based upon a tortured reading of her application. Her relevant response states in full: "After graduating with a degree in school psychology, I would like to independently contract with various school districts as an itinerant school psychologist. Additionally, I would like to offer pro bono counseling services to parents who have disabled or troubled children." An itinerant school psychologist, of course, works with children—specifically, disabled or troubled children—rather than adults. Moreover, Sjöstrand did not say she wanted to counsel adults *simpliciter,* but rather said she wants to counsel a certain kind of adult—namely, parents of disabled or troubled children. And Sjöstrand said she wants to do this counseling pro bono, which itself shows that it would not be her primary area of practice. Thus, the natural reading of this response—and indeed, many jurors might think, the only fair one—was that Sjöstrand's reference to counseling *parents* was entirely ancillary to counseling their children.

OSU's third reason—that Sjöstrand "did not mention anything specific to our mission in particular"—faults Sjöstrand for failing to answer a question that the program's application never asked. None of the application's 12 questions ask for commentary about the program's "mission in particular." Moreover, to the extent that the school's mission is to work with troubled or disadvantaged students in urban schools—and Joseph herself stumbled in seeking to define the school's mission in her deposition—Sjöstrand did discuss those issues in her response. That the application's instructions told Sjöstrand to respond to the school's 12 questions in three pages or less might also explain, in some juror's minds, why she did not say more.

OSU itself characterizes the two remaining reasons—that Sjöstrand had limited experience working with children, and lim-

ited research experience—as "minor," which itself undermines their importance as reasons for her rejection. And Professor Miranda testified, contrary to her employer's arguments now, that Sjöstrand's experience with children was "promising."

None of this is to say, of course, that a jury would necessarily find OSU's reasons for Sjöstrand's rejection to be pretextual. But it is to say that Sjöstrand presented evidence sufficient to create a genuine issue as to whether they were. The issue is one for a jury to decide.

### B.

 Sjöstrand also claims that OSU violated the Rehabilitation Act when it rejected her application. The Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of his or her disability, be ... subjected to discrimination[.]" 29 U.S.C. § 794(a). To prevail, Sjöstrand must make the same case as for her ADA claim, except she must show that she was denied admission "solely" because of her disability rather than "by reason of" it. See Burns v. City of Columbus, Dept. of Public Safety, Div. of Police, 91 F.3d 836, 841 (6th Cir.1996). For the reasons already stated, Sjöstrand's case presents a jury question under either standard.

\* \* \*

The district court's judgment is reversed, and the case remanded for proceedings consistent with this opinion.

MARTHA CRAIG DAUGHTREY, Circuit Judge, concurring in part and dissenting in part.

Plaintiff Caitlin Sjöstrand contends that Ohio State University violated the Americans with Disabilities Act when the university denied her admission to its doctoral program in school psychology, despite what she claimed were her superior qualifications. She attributed the rejection of her application to knowledge by the faculty members who interviewed her that she had been diagnosed with Crohn's disease. However, the record demonstrates beyond question that Sjöstrand's allegations of disability discrimination were premised wholly on factual inconsistencies, speculation, and conjecture. As a result, I am convinced that there was no basis on which to dispute the university's legitimate reasons for denying Sjöstrand's application and, further, that no reasonable jury could return a verdict in her favor. Thus, although I concur with the majority's determination that Sjöstrand met the less-than-onerous burden of establishing a *prima facie* case, I respectfully dissent from the conclusion that there is a genuine dispute of fact concerning the nature of the university's explanation for its decision.

### I.

In applying the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to Sjöstrand's claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), the majority first concludes that Sjöstrand adduced evidence sufficient to establish a *prima facie* case of discrimination. In order to establish a *prima facie* case under the ADA, "plaintiffs must allege either that they are or are perceived to be handicapped ..., that they are otherwise qualified for the [position], and that they were discriminated against on the basis of their disability." *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir.1997). Plaintiffs bringing a cause of action under the Rehabilitation Act, in addition to alleging a disability and qualifications for the position, must also establish that they were denied equal treatment

"*solely* by reason of [their] disability," 29 U.S.C. § 794(a) (emphasis added), and that the party alleged to be discriminating against them received "Federal financial assistance." *Id.*

Ohio State did not contest the fact that Sjöstrand had been diagnosed with Crohn's disease, that she had made an initial showing that she met the minimum qualifications for admission to the program, and that Ohio State receives federal financial assistance. Thus, the only disputed issue at the *prima facie* stage of the litigation was whether Sjöstrand could point to a genuine dispute over whether she was denied admission to the school-psychology program either "by reason of" her disability (ADA claim) or "solely by reason of" that disability (Rehabilitation Act claim). It is important to note, however, that "[t]he burden of establishing a prima facie case ... is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Because the standard is so easily met, I am willing to concede that Sjöstrand made out a *prima facie* case. Concomitantly, the majority concedes that Ohio State satisfied its burden of articulating legitimate, nondiscriminatory reasons for its decision to reject her application. Where we part ways is over the authenticity of those reasons—specifically, the majority's determination that Sjöstrand produced evidence sufficient to question whether the university's rationales were anything more than pretext to cover a discriminatory purpose.

## II.

The majority correctly notes that, generally, when reviewing a district court's grant of summary judgment, we must assume the truth of the non-moving party's evidence and construe all inferences from that evidence in the light most favorable to

that non-moving party. *See, e.g., Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir.2006). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy." *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir.2004) (internal quotation marks and citation omitted). Unfortunately for Sjöstrand, a thoughtful examination of the evidence upon which the majority relies to establish a genuine dispute regarding Ohio State's alleged discriminatory animus reveals that Sjöstrand's case is based solely upon the type of speculation and conjecture that we are not at liberty to consider as support for a reasonable jury determination.

## III.

For instance, the majority insists that we may infer that the true concern of Sjöstrand's interviewers was actually the plaintiff's Crohn's disease from the fact that they did not question Sjöstrand about her identification of an inappropriate mentor, but "instead devoted about half the interview to a discussion of her [disability]." It is true that Sjöstrand testified in her deposition that "seven to ten minutes" of her 20-minute interview with Dr. Radliff, and "seven to ten minutes" of her 20-minute interview with Dr. Joseph were spent discussing Question 10 on the school's application: "How do you respond to stress and novel situations?" Further deposition testimony established, however, that this allegation by the plaintiff was

blatantly false, as shown by the following colloquy with Sjöstrand:

Q. Let's talk about question 10. What did [Professor Radliff] ask you about that question?

A. She specified that *I had mentioned Crohn's earlier in the interview* and within my written application. And she asked if that would be a problem regarding my education in the school psychology program, how I would handle the stress of graduate school. (Emphasis added.)

Q. Do you recall how you responded?

A. In a response similar to that which I had written.[1] I indicated that I had learned how to manage my stress from Crohn's and that I had not had a Crohn's episode since high school.

Q. What, if anything, did Professor Radliff say or ask you about your response to the question?

A. She nodded in affirmation.

Q. Was there any further discussion about question 10 with Professor Radliff?

A. Not that I recall at this time.

\* \* \* \* \* \*

Q. What did Dr. Joseph ask you about question 10?

A. She framed it in the context of Crohn's.

Q. Can you explain what you mean?

A. She mentioned that *I had mentioned Crohn's,* and was I concerned that school psychology or the program at OSU would be too stressful, would the stress of the program and graduate

school in general, cause a flare-up, or a Crohn's episode, and how did I manage—or how was I planning to manage the stress of graduate school. (Emphasis added.)

Q. How did you respond?

A. In a manner similar to that which I said in Dr. Radliff's interview, that I have not had a Crohn's episode since high school. I have learned to manage my stress through my previous experiences with Crohn's, and I did not anticipate it being a problem.

Q. What, if anything, did Dr. Joseph say to you or ask you about your response?

A. She didn't.

It is incomprehensible that the two questions and the two answers recounted by Sjöstrand accounted for 14–20 minutes of the total 40–minute interview time. Such contradictory statements in the evidence put forth by the plaintiff justify the conclusion that Sjöstrand failed to create a genuine dispute of fact in this case. As we stated in *Bonds v. Cox,* 20 F.3d 697, 703 (6th Cir.1994):

It is indeed difficult, under these circumstances, to determine how to consider the evidence in the light most favorable to [the non-moving party] when her own allegations regarding the crucial issues of fact are in direct conflict. We do not believe that the standard of review for summary judgment ... requires us to ignore a party's own conflicting statements in construing the facts to her best advantage.

1. Sjöstrand's entire written response to question 10 on her application is as follows:

Over the years, I have learned that intense stress can trigger a Crohn's episode. This realization has required that I develop various coping mechanisms. I have taken up several hobbies and have learned to entertain myself with various activities. By nature, I am an easygoing person and am able to "go with the flow" very easily; learning how to manage my disease effectively has simply made me more so.

Nor can we view as anything more than mere conjecture the conclusion that Radliff's and Joseph's failure to ask Sjöstrand about her inappropriate selection of Dr. Granello as a faculty advisor meant that the professors based their decision to reject Sjöstrand's application on the existence of her Crohn's disease. Instead, given her application and her choice of Granello, faculty members were legitimately concerned that Sjöstrand's interest lay in school counseling, which was not part of Ohio State's graduate program in school psychology. In order to better calculate Sjöstrand's fit with their program, Radliff's and Joseph's questioning was calculated to tease out the applicant's real career interests and not allow her to tailor her answers to what she thought the interviewers wanted to hear from her. Thus, when questioned about why she did not ask Sjöstrand about her choice of a faculty mentor who was not in the school-psychology department, Radliff responded:

> I feel like I would be more likely to—to [say], "Now, you've been here, you've seen who the faculty are" and just curious if she's going to talk about working with one of us, what our research interests are and so forth.... I guess I would see it as kind of—maybe a potentially embarrassing issue. Wouldn't want to come across as trying to embarrass her for indicating an incorrect faculty member.

Similarly, Joseph testified that she did not ask Sjöstrand a direct question about her stated interest in school counseling—as opposed to school psychology—or about why she chose Dr. Granello as a mentor but, instead, tried to broach both subjects from a different prospective. Joseph explained:

> We don't want to lead the applicant into making responses that—that they think we want to hear. We really try to assess, ascertain whether or not this applicant is a right fit for what we have to offer in our program. So, you know, I mean—I mean, we really try to kind of leave it open for them to talk about so that we can better—best assess whether or not—We don't want to lead them in any way toward an answer or toward a response because we really want—we want it to be a natural—you know, as natural as it can be fit with—with what we have to offer.

\* \* \* \* \* \*

When I asked her questions about what her research interests are, we were looking for an opportunity for her to indicate any one of our areas of interest. So we left it open to her to indicate, because like I said, we don't like to lead the applicant into—You know, like if she would have said Dr. Granello and then followed up and said specific—some specific things about, you know, what we have to offer and—with regards to our research areas, that would be different.

Furthermore, all the evidence before us, including Sjöstrand's own deposition testimony, establishes without question that it was Sjöstrand herself, and not the interviewers, who introduced conversation about her Crohn's disease into the interview process. In addition, Dr. Antoinette Miranda, the third member of the school-psychology faculty, testified without contradiction that Sjöstrand's disability was never brought up or considered during the faculty's admissions deliberations. In fact, Miranda also said that the three faculty members "were really surprised that [Sjöstrand's Crohn's disease] was the reason she was saying she was being denied because for us that was not an issue" in making the decision, it "was not an issue that came up," and the three professors "didn't even talk about it." In light of the uncontroverted record before us, for the

majority now to assert that there is some genuine factual dispute over whether Sjöstrand's disability factored into the school's decision is pure speculation, bordering on the fantastical. Indeed, given the fact that Sjöstrand received her undergraduate degree from Ohio State, with honors, in only two-and-one-half years, Joseph, Radliff, and Miranda were clearly on notice that the plaintiff's Crohn's disease had not hampered, and presumably would not hamper, her academic efforts. Instead, they (and the university) relied upon legitimate, articulated reasons to deny Sjöstrand admission to the graduate program.

The majority lists those reasons and then proceeds to pick apart the rationales, all the while failing to recognize that it is only pure conjecture that would allow a reasonable jury to conclude that invidious discrimination, rather than the proffered logical explanations, precipitated the admissions decision. As it must, the majority concedes that Sjöstrand identified as an advisor a faculty member in a different department whose research interests did not coincide with the focus of the school-psychology program. But, instead of recognizing the legitimacy of the desire by a very small faculty to train students whose own research and career interests aligned with theirs, the majority suggests that their focus on Sjöstrand's choice of Granello as an advisor must have been an attempt to cover up a discriminatory intent. Rather than pointing to any actual facts in support of that idea, however, the majority simply notes that another applicant who was accepted into the program identified no mentor at all in her application. But choosing not to name a particular faculty member with whom to collaborate on projects within the scope of the program's mission is very different from identifying an unavailable faculty advisor from outside the relevant academic depart-

ment. It borders on the preposterous to conclude that the university's rationale in this regard was somehow an effort to mask an intent to treat Sjöstrand differently "by reason of" or "solely by reason of" a supposed disability that had not actually manifested itself for some three years.

The majority also holds that disputes of fact regarding the discriminatory animus of the university were manifested by its listing of the following conceded facts as additional reasons for denying Sjöstrand admission to the graduate program: (1) the plaintiff's wish to serve as an itinerant psychologist who would spend a portion of her time offering counseling services to adults; (2) the failure of Sjöstrand's application to reflect an understanding of the unique niche that the Ohio State graduate program in school psychology filled and, importantly, that was seemingly at odds with Sjöstrand's career goals; (3) the plaintiff's limited experience working with children, the very focus of the school-psychology program; and (4) Sjöstrand's relative lack of research activity, even though the program leaders felt that "prior research experiences are important at the doctoral level." Again, however, only by engaging in mere speculation and conjecture can the majority attribute invalid motives to such decision-making.

As has been made abundantly clear by the appellate record, Ohio State's doctoral program in school psychology was a small one, served by only three faculty members. As such, the program had limited spaces available for students if the three professors were to fulfill their essential function of instructing graduate students and directing their research projects. Consequently, those in charge of the doctoral program, which had as its mission a focus on issues affecting diverse, urban school districts, sought to admit individuals

drawn to that mission. As Dr. Radliff explained:

[T]he OSU School Psychology program is a specialized program, specializing in urban education. We have a social justice emphasis, and so some of the questions here are to get at what is a student's interest in coming to OSU in particular. And we're looking to see are they interested in our mission, because our program may be a little bit different and have different foci than other School Psychology programs, and then also just a general interest in their working and—experiences and working with children, adolescents and then in particular their experiences working with diverse youth, urban education or working in an urban setting types of things, so have they had some experiences that would relate to the types of experiences that they will be getting in the program....

Despite her lack of background in dealing with children or with inner-city schools, Sjöstrand was invited to interview with department officials in large part due to the stellar academic record she compiled as an undergraduate. Through her written application answers and through her responses to interview questions, however, Sjöstrand failed to express an awareness of or an appreciation for the unique role the school viewed itself as filling. To the contrary, the plaintiff admitted in her deposition that she applied to the Ohio State program only because "[i]t was the closest school in proximity to my home and my family and my church." The university's consideration of the disconnect between the school's mission and Sjöstrand's goals, its consideration of the incompatibility of Sjöstrand's research interests with those of her potential faculty advisors, and its consideration of the plaintiff's lack of experience in the very matters the program emphasized all justified the decision not to admit Sjöstrand to the doctoral program. The plaintiff and the majority can point to no facts or evidence that would allow a reasonable jury to conclude otherwise, at least not in the absence of speculation or conjecture.

**IV.**

Despite our claims to national enlightenment and exceptionalism, there is no doubt that our country still tolerates the existence of discrimination in its many forms. One need only open a newspaper, watch television "news," or log on to any of innumerable websites to be bombarded with examples of race-based, gender-based, ethnicity-based, religion-based, or disability-based discrimination. In an effort to eradicate the effects of such malice, federal statutes like the ADA and the Rehabilitation Act stand as bulwarks against the ignorance and mean-spiritedness that spawn such destructive attitudes. That being said, however, the setback that Caitlin Sjöstrand experienced when she applied to Ohio State University's doctoral program in school psychology cannot be attributed to invidious discrimination. The majority concludes that "Sjöstrand presented evidence creating a genuine issue as to whether" the school's reasons for rejecting the plaintiff's application for admission were pretextual. Although I agree that Sjöstrand satisfied her less-than-onerous burden of establishing a *prima facie* case of disability discrimination, only rank speculation and conjecture would allow a reasonable jury to find that Ohio State harbored discriminatory animus toward Sjöstrand based upon the fact that she had been diagnosed with Crohn's disease. I therefore respectfully dissent from the majority's determination that the judgment of the district court should be reversed.