NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0411n.06

No. 14-6359

**FILED**
Jun 05, 2015
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

DAVID WILLIAMS,                                         )
                                                       )
        **Plaintiff-Appellant,**                       )        ON APPEAL FROM THE
                                                       )        UNITED STATES DISTRICT
v.                                                     )        COURT FOR THE WESTERN
                                                       )        DISTRICT OF KENTUCKY
UNION UNDERWEAR COMPANY, INC.,                         )
d/b/a FRUIT OF THE LOOM,                               )
                                                       )        **OPINION**
        **Defendant-Appellee.**                        )
                                                       )

Before:  MOORE and COOK, Circuit Judges, and COHN, District Judge.[*]

**KAREN NELSON MOORE, Circuit Judge.**   Plaintiff-Appellant David Williams worked for Defendant-Appellee Union Underwear Company, Inc., d/b/a Fruit of the Loom ("FOL"), for over ten years before FOL terminated his employment.  Williams contends that FOL fired him because of his association with his ill wife and his age in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b)(4) (2012), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a) (2012).  FOL asserts that Williams had been performing below expectations long before his termination, and that Williams's poor performance—not his wife's disability or his age—was the reason for his termination.  Williams has not made a prima facie showing that his wife's disability was a determining factor in FOL's decision to terminate him.  Nor has he made a prima facie showing

---

[*]The Honorable Avern L. Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

of age discrimination because he has not produced evidence that FOL replaced him with a substantially younger person. And, even if Williams had made a prima facie showing for either claim, we agree with the district court that Williams has not produced evidence from which a reasonable jury could conclude that FOL's proffered reason for the termination was a pretext for discrimination. Thus, we **AFFIRM** the district court's grant of summary judgment.

## I. FACTS

Williams worked in FOL's Internal Audit Department from April 1983 through June 1998, and then again from March 2007 until FOL terminated Williams's employment on December 31, 2011. R. 13-1 at 5, 10 (Williams Dep. at 17–19, 38) (Page ID #430, 435). As the senior manager of internal audit, Williams's primary responsibilities were assisting with the Office of Foreign Asset Control ("OFAC") compliance program to ensure that FOL did not trade with any prohibited foreign entities and developing and conducting licensee audits. *See id.* at 11–13 (Williams Dep. at 41–49) (Page ID #436–38). Throughout the majority of Williams's tenure at FOL, the Internal Audit Department performed two or three OFAC audits each year, which required Williams to work anywhere from five to 600 hours to complete the task and involved travel to an offsite location. *Id.* at 14 (Williams Dep. at 53–56) (Page ID #439). Licensee audits also involved out-of-state travel to the licensee's location. *Id.* at 14–15 (Williams Dep. at 55–57) (Page ID #439–40). Until 2009, Williams did not receive any negative feedback about his performance. R. 20-1 at 18–19 (Williams Dep. at 72, 76) (Page ID #715–16).

2

In January 2008, Berkshire Hathaway, Inc., FOL's parent company, hired the accounting firm Ernst & Young to assess FOL's Internal Audit Department. R. 13-11 at 3 (Crossland Dep. at 11) (Page ID #353). In January 2009, Ernst & Young submitted a report to FOL, identifying four areas where the Internal Audit Department only partially conformed to the assessment standards. *See* R. 16-3 at 8–9 (E&Y Report) (Page ID #494–95). Based on Ernst & Young's assessment, Berkshire Hathaway directed FOL to change its internal auditing process. R. 13-11 at 3 (Crossland Dep. at 11) (Page ID #353). Anthony Crossland, who oversaw FOL's Internal Audit Department, decided to transition to process-oriented audits instead of manufacturing audits. *Id.*

After receiving these directions from Berkshire Hathaway, Crossland noticed problems with Williams's performance as senior manager of internal compliance. *Id.* at 4 (Crossland Dep. at 14) (Page ID #354). In Williams's 2009 performance appraisal, Crossland mentioned that with respect to the OFAC audits Williams "need[ed] to accept more responsibility going forward and improve his management skills to plan, staff and evaluate engagements, independent of management, in order for the department to achieve its objectives." R. 13-7 at 3 (2009 Williams Performance Evaluation) (Page ID #169). Nevertheless, Crossland gave Williams an overall performance evaluation of "Meets Objectives." *Id.*

In November 2009, FOL hired Jimmy Woodall, a former Ernst & Young audit manager, to "upgrad[e] the professionalism," of FOL's Internal Audit Department and implement new strategic goals for the department. R. 13-12 at 2–3 (Woodall Dep. at 7, 9–10) (Page ID #366–

67). When Woodall started working at FOL, Crossland discussed the auditors' performances with Woodall and specifically noted that Williams "did not demonstrate an understanding of what he was being asked to do"; Crossland mentioned that he spent a lot of time reviewing or redoing Williams's work. *Id.* at 5–7 (Woodall Dep. at 18–22) (Page ID #369–70). Williams contends that the changes Woodall made to the department's work practices caused him to have difficulty keeping up with his work. *See* Appellant Br. at 12. Williams started working seven days every week to keep up with his deadlines. R. 20-2 at 8 (Williams Dep. at 175–76) (Page ID #741).

In February 2011, Williams informed Woodall that his wife had been diagnosed with Wegener's Vascular Disease, which weakened her immune system and made her very susceptible to contracting diseases. R. 20-2 at 12 (Williams Dep. at 190) (Page ID #745). Williams had mentioned his wife's rare disease at work before, but had not ever requested an accommodation. R. 20-2 at 12–13 (Williams Dep. at 190–93) (Page ID #745–46). Williams explained to Woodall that he could not travel to Central America for a scheduled audit trip because he might infect his wife with foreign viruses or bacteria. *Id.* at 12 (Williams Dep. at 190) (Page ID #745). Woodall told Williams that the department would work around the absence from the trip. *Id.* at 13 (Williams Dep. at 195) (Page ID #746). Woodall spoke with Human Resources about the Williamses' predicament and followed up with Williams to request documentation from a doctor, which Williams provided. *Id.* (Williams Dep. at 195–96). After Williams delivered the letter from his wife's doctor, Vickie Gibson from Human Resources met

with Williams to explain that FOL expected Williams to travel when he was scheduled. *Id.* at 14 (Williams Dep. at 197–98) (Page ID #747). The Internal Audit Department went forward with the planned audit without Williams. *Id.* (Williams Dep. at 197). This 2011 trip was the only out-of-country audit that Williams was unable to attend because of his wife's condition. R. 13-4 at 90 (Williams Dep. at 199) (Page ID #90).

In January 2011, Crossland evaluated Williams's work again, giving Williams an overall rating of "Needs Improvement." R. 13-7 at 5 (2010 Williams Performance Review) (Page ID #171). In the evaluation, Crossland noted a number of reasons for Williams's needs-improvement evaluation. *See id.* at 6 (Page ID #172). "A few months into 2011," Gibson approached Woodall to discuss Williams's most recent performance appraisal and instructed Woodall to initiate a performance feedback plan with Williams because Williams had received a needs-improvement performance rating. R. 13-12 at 7 (Woodall Dep. at 26) (Page ID #371). On May 4, 2011, Woodall, Crossland, and Gibson met to discuss Williams's performance improvement plan and drafted a performance feedback form. R. 16-5 at 2–3 (Gibson Aff. ¶ 4) (Page ID #523–24). They identified eighteen examples of how Williams had performed below expectations, set three objectives for improvement, and drafted a sixty-day action plan for Williams to address the performance deficiencies. R. 13-7 at 7–15 (Page ID #173–81).

Williams struggled at work during the sixty-day review period. Woodall had set a new timeframe for Williams to complete his work, and Williams had a difficult time adjusting to complete the projects on time. R. 13-3 at 14–15 (Williams Dep. at 188–89) (Page ID #87–88).

According to Williams, Woodall interrupted Williams's work constantly to discuss the projects, ask questions, or to relay information orally. *Id.* at 14 (Williams Dep. at 188) (Page ID #87). Williams found Woodall's behavior to be very disruptive and reported that he felt like Woodall was picking on him. *Id.* at 14–15 (Williams Dep. at 188–89) (Page ID #87–88).

At the end of the sixty-day review period, Crossland, Woodall, and Gibson concluded that Williams had not met the objectives of his performance plan. On August 25, 2011, they presented Williams with a Performance Improvement Plan. R. 13-8 at 1–8 (Williams PIP) (Page ID #207–14). The PIP gave Williams ninety days to improve his job-performance deficiencies, including "[p]roject management and prioritization," the "[q]uality of work product," "[r]isk assessment and identification of audit objectives," and "[o]wnership and responsibility for assignments and departmental goals." *Id.* at 1 (Page ID #207). Under FOL's disciplinary guidelines, a PIP serves as a final written warning before termination, and FOL does not guarantee that the employee has the full ninety days to improve his or her performance. R. 13-13 at 10 (Gibson Dep. at 39) (Page ID #390). FOL offered Williams an alternative to the PIP: he could transition out of FOL and receive seven weeks' compensation. *Id.* (Gibson Dep. at 40). Williams chose to remain at FOL and try to make the required improvements, stating that he could not leave FOL because he needed to keep his medical insurance. R. 20-2 at 25 (Williams Dep. at 241) (Page ID #758).

From August 29 through November 15, 2011, Williams met with Woodall weekly. *Id.* at 19–23, 27 (Williams Dep. at 217–35, 251) (Page ID #752–56, 760). While Williams was

working to address his performance issues referenced in the PIP, FOL was restructuring its Internal Audit Department because, according to Newton, the department was inefficient due to the fact that there were too many senior audit managers and too few staff auditors. R. 13-14 at 3–4 (Newton Dep. at 12–16) (Page ID #401–02). FOL also transferred OFAC compliance to the Customs Compliance Department and reduced the number of OFAC audits to one per year, which meant that OFAC auditors had to spend significantly less time to perform the audit. R. 20-1 at 24 (Williams Dep. at 95) (Page ID #721); R. 16-24 at 3 (Sanders Aff. ¶ 4) (Page ID #627). FOL transferred OFAC compliance responsibilities to Jonathan Bellamy, an export compliance analyst, who spent approximately ten percent of his time working on OFAC compliance. R. 16-24 at 3 (Sanders Aff. ¶ 4) (Page ID #627).

In November 2011, Gibson concluded that Williams had not shown signs of improvement and recommended to George Fields, the Senior Vice President of Human Resources, that Williams be terminated. R. 13-13 at 7 (Gibson Dep. at 26–27) (Page ID #387). On November 4, 2011, Fields, Gibson, Woodall, and Crossland met with Executive Vice President and Chief Financial Officer Bill Newton to discuss Williams's future at FOL. R. 16-5 at 3 (Gibson Aff. ¶ 5) (Page ID #524). Newton identified three options regarding Williams: (1) to terminate Williams for poor performance and non-compliance with the PIP; (2) to transfer Williams to another department; or (3) to restructure the organization and eliminate Williams's position. R. 13-14 at 5 (Newton Dep. at 17–18) (Page ID #403). Newton could not find Williams a position in another department, so he elected the third option; Newton restructured

the Internal Audit Department and distributed Williams's work responsibilities. *Id.* On December 2, 2011, Newton and Fields met with Williams to inform him of their decision. FOL offered Williams thirteen weeks of severance pay and the option to continue working at FOL through December 31, 2011, which would allow Williams to receive FOL's 2011 Management Incentive Plan benefit, in exchange for a release. R. 13-5 at 4–5 (Williams Dep. at 267–71) (Page ID #108–09).

Williams rejected the offer, refused to sign the release, and filed a complaint with the EEOC, alleging that FOL had violated the ADA and the ADEA. After the EEOC issued a right-to-sue letter, Williams filed the instant suit, alleging violations of the ADA, ADEA, and the Family and Medical Leave Act ("FMLA"). R. 1 at 1–4 (Compl. ¶¶ 1–14) (Page ID #1–4). FOL filed a motion for summary judgment with respect to all of Williams's claims, which the district court granted. R. 31 at 1–12 (Mem. Op.) (Page ID #1094–1105). Williams now appeals the judgment with respect to his ADA and ADEA claims.[1]

## II. ANALYSIS

Williams has not offered direct evidence of associational disability discrimination or age discrimination and therefore relies on the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973), to analyze the circumstantial evidence of discrimination. Under that framework, he must first establish a prima facie case of discrimination. *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011) (ADA);

---

[1]In the district court, Williams conceded that he could not prevail on his FMLA claim. R. 20 at 43 (Pl.'s Resp. to Mot. for Summ. J.) (Page ID #692).

*Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008) (ADEA). If he satisfies this initial burden of production, then FOL must produce evidence that it had a legitimate, non-discriminatory reason to terminate Williams. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (ADA); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (ADEA). If FOL meets that burden, then Williams must produce evidence that FOL's proffered reason is mere pretext for associational disability or age discrimination. *Talley*, 542 F.3d at 1105 (ADA); *Ercegovich*, 154 F.3d at 350 (ADEA).

We review de novo a district court's grant of summary judgment to "determine whether there exists a 'genuine dispute as to any material fact'" relevant to the outcome of Williams's ADA and ADEA claims. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (en banc) (quoting Fed. R. Civ. P. 56(a)). We view the evidence in the light most favorable to Williams and draw all reasonable inferences in his favor. *Lexicon, Inc. v. Safeco Ins. Co. of Am., Inc.*, 436 F.3d 662, 667 (6th Cir. 2006). "'An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014) (quoting *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 451 (6th Cir. 2004)).

## A. The ADA Claim

The ADA prohibits employers from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association[.]" 42 U.S.C. § 12112(b)(4).

Williams alleges that FOL discriminated against him because of his wife's disability, i.e., Wegener's Vascular Disease. There are typically three theories of ADA associational discrimination: "(1) expense; (2) disability by association; and (3) distraction." *Stansberry*, 651 F.3d at 487 (internal quotation marks omitted). Under the expense theory, an employer violates the ADA if it takes an adverse employment action against an employee because of the cost of insuring the associated disabled person under the employer's health plan. *Id.* The disability-by-association theory takes two forms: (1) if "the employer fears that the employee may contract the disability of the person he or she is associated with," or (2) if "the employee is genetically predisposed to develop a disability that his or her relatives have." *Id.* Under the distraction theory, an employer violates the ADA if it discriminates against an employee because the employee has been "somewhat inattentive at work because of the disability" of the associated person. *Id.* Williams apparently relies on all three theories. *See* Appellant Br. at 15, 22–24.

To establish a prima facie case of associational discrimination, Williams must produce evidence from which a reasonable jury could conclude (1) that he was qualified for the position; (2) that FOL subjected him to an adverse employment action; (3) that FOL knew that his wife had a disability; and (4) that the adverse employment action "raises a reasonable inference that the disability of [his wife] was a determining factor in the decision." *Stansberry*, 651 F.3d at 487.

The district court concluded that Williams had not met his initial burden because he had not produced evidence to support a reasonable inference that FOL terminated his employment

10

because of his wife's disability. We agree. The only evidence Williams has introduced to support his claim under the expense theory is that Williams—not FOL—raised the issue of health insurance when Willliams discussed his future at FOL with Gibson, Woodall, and Crossland. R. 20-2 at 25 (Williams Dep. at 241) (Page ID #758). Gibson, Woodall, and Crossland did not respond to Williams's comment about health insurance. *Id.* This evidence is not sufficient to support a reasonable inference that FOL treated Williams adversely because of his wife's illness because Williams has not connected this single reference to health insurance to FOL's decisions. Williams simply has not identified any evidence to support an ADA claim under the disability-by-association theory because he has not produced evidence that Wegener's Vascular Disease is contagious or that Williams's supervisors feared that Williams would infect other employees at FOL. In addition, Williams has not produced evidence showing that FOL terminated him because it thought he was inattentive at work because of his wife's illness. Accordingly, Williams has not satisfied his burden to produce evidence of a prima facie case of ADA associational discrimination because no reasonable jury could believe there was a causal connection between his wife's disability and his termination.

## B. The ADEA Claim

Williams has also alleged that FOL violated the ADEA by terminating him because of his age. The ADEA, 29 U.S.C. § 623(a)(1), prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." To establish a prima

facie case of age discrimination under the ADEA, Williams must produce evidence (1) that he was over the age of forty, and therefore a member of the class of persons protected by the ADEA; (2) that FOL subjected him to an adverse employment action; (3) that he was qualified for the position; and (4) that FOL replaced him with someone who was "substantially younger than" Williams.[2] *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003). Williams "retains the burden of persuasion to establish that age was the 'but-for' cause of [FOL's] adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).

The district court concluded that Williams has not met his burden to produce evidence establishing a prima facie case of age discrimination because he did not show that FOL replaced him with a younger employee. R. 31 at 11 (Mem. Op.) (Page ID #1104). We agree. The only evidence Williams cites to support his contention that FOL replaced him with a younger employee is that Williams heard from "[s]omeone out there" that, after FOL terminated Williams, five people went to OFAC training. R. 13-5 at 2 (Williams Dep. at 260) (Page ID #106). Williams asserts that this is evidence that FOL had to train five people to replace him. Appellant Br. at 25. This statement by an unidentified third party is classic hearsay: a statement made out of court, which Williams now offers to prove the truth of the matter asserted, i.e., that FOL sent five people to OFAC training. *See* Fed. R. Evid. 801(c). Although the evidence

---

[2]"While some of this Circuit's cases, in reciting the elements of a prima facie case, have stated that an ADEA plaintiff must show that he was replaced by someone outside of the protected class, *e.g.*, *Geiger* [*v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009)], it is sufficient to show that a replacement is substantially younger" than the plaintiff. *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 333–34 (6th Cir. 2012).

Williams may produce in response to FOL's motion for summary judgment need not be admissible at trial, he must nevertheless "show that [he] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (emphasis in original). Thus, we must disregard this hearsay evidence when considering a motion for summary judgment. *Id.*

Williams cannot show that FOL replaced him because "[a] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Grosjean*, 349 F.3d at 336 (internal quotation marks omitted). FOL concedes that Bellamy absorbed Williams's OFAC compliance work, but notes that this function constitutes only ten percent of Bellamy's work responsibilities. R. 16-24 at 3 (Sanders Aff. ¶ 4) (Page ID #627). FOL distributed the remainder of Williams's job responsibilities among the members of the Internal Audit Department and eliminated the senior-manager position that Williams had held. R. 20-7 at 16–17 (Newton Dep. at 17–18) (Page ID #975–76). All of Williams's duties were reassigned or redistributed within the Internal Audit Department, and therefore Williams has not shown that he was "replaced." *See Grosjean*, 349 F.3d at 336. Thus, Williams has not produced evidence establishing a prima facie case of age discrimination.

**C. Pretext**

Even if we assume that Williams has established a prima facie case of associational disability and age discrimination, he has not offered evidence that FOL's legitimate, non-discriminatory reason for his termination—Williams's alleged poor performance—was mere pretext for associational disability or age discrimination. Williams "may demonstrate that [FOL's] explanation is not credible by demonstrating that the proffered reason[] (1) had no basis in fact, (2) did not actually motivate [FOL's] action, or (3) [was] insufficient to motivate [FOL's] action." *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 486 (6th Cir. 2010).

Williams contends that FOL's stated reason has no basis in fact because he had not received complaints about his performance until Woodall became his manager, and he argues that a jury should assess the basis for the evaluations because performance evaluations are inherently subjective. *See* Appellant Br. at 10–11, 26. But Williams overlooks that both Crossland and Woodall noted problems with Williams's job performance, and both Crossland and Woodall documented those problems over nearly a two-year period. Moreover, Williams's performance problems pre-date his wife's diagnosis. Crossland noted issues with Williams's performance in 2009, R. 13-7 at 3 (2009 Williams Performance Evaluation) (Page ID #169), but Williams did not discuss his wife's illness until 2010. Indeed, none of Williams's supervisors indicated that they believed that the quality of his work declined because he was distracted by his

14

wife's disability. Williams thus has not produced evidence from which a reasonable jury could conclude that he was not, in fact, performing below company expectations.

As additional evidence of age discrimination, Williams testified that Woodall said, "I really don't want to hire Johnny [Cagle], he's older than the other guys." R. 20-2 at 25 (Williams Dep. at 241–42) (Page ID #758). Although Woodall ultimately hired Cagle, Williams claimed that Woodall stated multiple times that the thirty-year-old applicants "were forcing [him to hire Cagle] because these younger guys won't accept the position, they won't come to work for us." *Id.* (Williams Dep. at 242–43). In contrast, Woodall asserts that he was hesitant to hire Cagle because Cagle was overqualified for the position and lived in a different city, and therefore would not remain with the company. R. 16-2 at 3–4 (Woodall Aff. ¶¶ 6–7) (Page ID #485–86). Woodall also asserts that Cagle was the only applicant for the position to whom FOL made an offer of employment. *Id.* at 4 (Woodall Aff. ¶ 7) (Page ID #486).

Not every ageist comment by a manager is relevant evidence of discriminatory intent. *Ercegovich*, 154 F.3d at 357. To determine whether Woodall's statements are relevant evidence of discriminatory intent, we "must carefully evaluate factors affecting the statement's probative value, such as the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action, as well as whether the statement buttresses other evidence of pretext." *Id.* (citation and internal quotation marks omitted). There is little doubt that Woodall was one of the managers who chose to terminate Williams. When viewed in the light most favorable to Williams, the

15

comment certainly suggests that Woodall was considering Cagle's age in the hiring process for the senior-manager position, and a reasonable jury could find that these comments might suggest discriminatory intent.

The other factors, however, do not support Williams's contention that Woodall's isolated comment about another employee is evidence that Woodall and FOL discriminated against Williams on the basis of age. First, Woodall hired Cagle for the position, R. 16-2 at 4 (Woodall Aff. ¶ 7) (Page ID #486), which undercuts Williams's assertion that Woodall did not wish to hire older employees. Second, there appears to be very little temporal proximity between Woodall's comments and Williams's termination. Woodall was considering hiring Cagle for the position of staff auditor in May 2011, and Williams was fired seven months later in December 2011. Third, and fatally, Williams has not offered any other evidence to buttress a finding that this statement is evidence of pretext. *See Ercegovich*, 154 F.3d at 356–57 (analyzing comments by other employees as buttressing "a cumulative managerial attitude" biased against employees over the age of forty). Thus, no reasonable jury could conclude that Woodall's comments about Cagle were evidence that the true reason that Williams was fired was his age. In sum, Williams has not produced evidence from which a reasonable jury could conclude that FOL's proffered non-discriminatory reason for terminating Williams was mere pretext for associational-disability or age discrimination.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment.