NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0097n.06

Nos. 17-5628/6046

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| TRI-CITIES HOLDINGS LLC et al., | ) | **FILED** |
| **Plaintiffs-Appellants,** | ) | Feb 28, 2018 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | |
| TENNESSEE ADMINISTRATIVE PROCEDURES | ) | ON APPEAL FROM THE |
| DIVISION et al. (17-5628); TENNESSEE | ) | UNITED STATES DISTRICT |
| HEALTH SERVICES AND DEVELOPMENT | ) | COURT FOR THE EASTERN |
| AGENCY et al. (17-6046), | ) | DISTRICT OF TENNESSEE |
| **Defendants-Appellees.** | ) | |
| | ) | **OPINION** |

Before:  MOORE, THAPAR, and LARSEN, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  This consolidated appeal caps a trilogy of

federal lawsuits brought by the would-be owner and operator of a methadone[1] clinic in Johnson

City, Tennessee, on behalf of itself and several prospective clients, under the Americans with

---

[1]"Methadone is the oldest FDA-approved medication for treating opioid dependence." Barbara Andraka-Christou, *What Is "Treatment" for Opioid Addiction in Problem-Solving Courts?*, 13 STAN. J. C.R. & C.L. 189, 221 (2017).  The synthetic drug—a substitute for more baneful opioids—"works by activating opioid receptors in the brain" so as to "prevent[] cravings," ward off withdrawal symptoms, and "prevent[] a sense of euphoria or a 'high' if a person abuses heroin or painkillers while undergoing methadone treatment." *Id.*  At the same time, "[m]ethadone can be dangerous if diverted and improperly used," *id.*, and a 2012 report found that methadone was "involved in one third of [opioid-pain-reliever]-related overdose deaths," despite comprising less than two percent of opioid-pain-reliever prescriptions, CENTERS FOR DISEASE CONTROL & PREVENTION, *Vital Signs: Risk for Overdose from Methadone Used for Pain Relief—United States, 1999–2010*, 61 MORBIDITY & MORTALITY WEEKLY REP. 493, 493–94 (2012) [hereinafter "*Risk for Overdose*"].  Both methadone users and clinics set up to serve them have standing to bring suits like this one. *See MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335–36 (6th Cir. 2002).

Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794. The primary Plaintiff-Appellant is Tri-Cities Holdings ("TCH"), a Georgia corporation, and the other Plaintiffs-Appellants have been anonymized as John and Jane Does.[2] The Defendants-Appellees are Tennessee state and local government actors who, in one way or another, stood in the way of TCH's efforts to open the proposed clinic. For the reasons that follow, we **AFFIRM** the district court's grant of summary judgment to all defendants.

## I. BACKGROUND

### A. State and Local Laws Governing the Establishment of Methadone Clinics

Perhaps unsurprisingly, Tennessee regulates the establishment of medical-services providers. An entity seeking to set up "any type of health care institution" must first obtain a "certificate of need" ("CON") from the state's Health Services and Development Agency ("HSDA") through a vote of its eleven-member board (all of whom are defendants-appellees here). *See* Tenn. Code Ann. §§ 68-11-1604, -1607(a). Before it goes to the HSDA, however, a CON application is reviewed by one of three state departments, who both check the application's claims and evaluate the application under three statutorily inscribed criteria: need, economic feasibility, and contribution "to the orderly development of adequate and effective health care facilities or services." *See* § 68-11-1609(b); *TCH III* R. 15-1 (Review of CON Application at

---

[2]For simplicity, we refer to Plaintiffs-Appellants collectively as "TCH," distinguishing only where relevant.

2) (Page ID #131).[3]  In the case of a methadone clinic, the evaluator is the state's Department of Mental Health and Substance Abuse Services ("DMHSAS") (another defendant-appellee here).

All CON applicants are required to give some general notice of their intentions:  they must file a "letter of intent" and then publish that letter "in a newspaper of general circulation in the proposed service area of the project."  *Id.* § 68-11-1607(c)(1).  But there is an additional notice requirement that applied specifically to would-be methadone clinics at the time of TCH's CON application and that now applies to *any* "nonresidential substitution-based treatment center for opiate addiction."  *Id.* § 68-11-1607(c)(9)(A); 2015 Tenn. Pub. Acts, ch. 505.[4]  This extra provision requires that any such applicant also mail notice to a handful of local elected officials, including the relevant municipality's mayor.  Tenn. Code Ann. § 68-11-1607(c)(9)(A).

A CON applicant may request that the HSDA hold a public hearing prior to its vote. Tenn. Code Ann. § 68-11-1608(b).  "[A] local governing body" may, upon request, "participate in" that hearing "and express support or opposition," although such "testimony . . . shall be informational and advisory" only.  *Id.* § 68-11-1624.[5]  If a CON application is denied, the applicant may appeal to a state administrative law judge ("ALJ").  *Id.* § 68-11-1610.

---

[3]Because this consolidated case includes two district court records, we use "*TCH II*" or "*TCH III*" before each record citation unless context makes clear which one is being referenced.

[4]The methadone-specific version of this provision was codified at Tenn. Code Ann. § 68-11-1607(c)(3).  There is no suggestion that the Tennessee legislature's slight broadening of the provision, which may reflect the ascendancy of newer forms of treatment, affects this case.

[5]At the time of TCH's CON application, Tenn. Code Ann. § 68-11-1624 applied only to "a hearing conducted by the agency for a nonresidential substitution-based treatment center for opiate addiction," but it now applies to any CON application hearing.  2015 Tenn. Pub. Acts, ch. 505.

Johnson City also regulates the establishment of methadone clinics within city limits, which may be located only in areas zoned "MS-1." *TCH II* R. 41-5 (Johnson City Zoning Requirements at 96–97) (Page ID #864–65). The ordinance in operation when TCH sought a CON also required that such clinics, among other requirements, (1) have first obtained a CON; (2) "not be located within two hundred (200) feet of a school, day-care facility, or park"; (3) operate only between 7:00 AM and 8:00 PM; and (4) "be located on" and provide "primary access . . . from an arterial street." *TCH II* R. 44-1 (Old Ordinance) (Page ID #1821–22).[6]

## B. *Tri-Cities I*, TCH's CON Application, and *Tri-Cities II*

TCH's first federal lawsuit, *Tri-Cities Holdings LLC et al. v. Johnson City et al.* ("*Tri-Cities I*"), No. 2:13-cv-108, challenged Johnson City's zoning ordinances and argued that various city defendants (all of whom are also defendants-appellees here[7]) had violated the ADA and RA by refusing to issue necessary permits to TCH. *TCH II* R. 19-3 (*Tri-Cities I* Compl.) (Page ID #468–70). The district court dismissed that suit on June 12, 2013, on ripeness grounds. *TCH II* R. 19-1 (*Tri-Cities I* Dist. Ct. Op. & Order at 8–10) (Page ID #465). The district court reasoned that, in light of the absence of a CON, it was "virtually impossible . . . to determine any likelihood that the harm alleged by plaintiffs will ever come to pass," and moreover there was "minimal hardship on the parties" to delay adjudication until TCH obtained a CON. *Id.* at 8–9

---

[6]In 2015, Johnson City revised its ordinance, apparently eliminating the regulations on hours of operation and distance from other types of properties while retaining its requirement that a CON be obtained and presented. *TCH II* R. 214-7 (New Ordinance) (Page ID #6039–41).

[7]For simplicity, we refer to these defendants-appellees collectively as "Johnson City."

4

(Page ID #463–64). The district court accordingly entered a judgment of dismissal without prejudice. *TCH II* R. 19-2 (*Tri-Cities I* J.) (Page ID #467). TCH did not appeal.

TCH filed a second federal lawsuit, *Tri-Cities Holdings LLC et al. v. Tenn. Health Servs. & Dev. Agency et al.* ("*Tri-Cities II*"), No. 3:13-cv-669,[8] which is one of the two cases in this consolidated appeal (No. 17-6046), after the HSDA denied TCH's CON application by a vote of 3–6–1 after a lengthy public hearing on June 26, 2013, *TCH III* R. 31-3 (Tr. of CON Application Hr'g at 3, 197) (Page ID #1021, 1215). In addition to HSDA board members and staff, the attendees included a range of community members, including local political leaders, as well as a minister, several doctors, at least one educator, and a nurse. *See id.* at 5 (Page ID #1023). The hearing began with HSDA General Counsel Jim Christoffersen advising participants not to base their decisions on any Johnson City zoning issues in light of the unresolved litigation and then reading aloud a letter from TCH's attorney, James Dunlap, asking that, were the application to be denied, "the applicant be provided all reasonable accommodations or modifications to any and all applicable rules and requirements necessary to enable its application to be approved, as required by the ADA and the RA."[9] *Id.* at 9 (Page ID #1027).

---

[8]This suit, filed in the Middle District of Tennessee, was ultimately transferred to the Eastern District of Tennessee as *Tri-Cities Holdings LLC v. Tenn. Health Servs. & Dev. Agency*, No. 2:13-cv-305.

[9]This was one of many functionally identical requests that Dunlap made to the various state and local entities involved in this case for "reasonable accommodations or modifications" to state and local policies in order to allow TCH to open its clinic. *See, e.g.*, *TCH III* R. 31-3 (Tr. of CON Application Hr'g at 197) (Page ID #1215); *TCH III* R. 15-5 (Dunlap Letter to HSDA at 1–3) (Page ID #484–86); *TCH III* R. 15-6 (Dunlap Letter to ALJ Summers at 1) (Page ID #504).

5

Some of the hearing's discussion focused on DMHSAS's eighteen-page report, which the department had submitted about two weeks prior. *TCH III* R. 15-1 (Review of CON Application at 1) (Page ID #130). DHMSAS had concluded that it could not "support approval of the application because" two of the three statutory criteria—need, economic feasibility, and contribution to the orderly development of healthcare—"ha[d] not been met." *Id.* at 4 (Page ID #133). While observing that economic feasibility, "ha[d] possibly been established," *id.* at 6 (Page ID #135), the report stated that need for this particular type of facility "ha[d] not been clearly established," *id.* at 5 (Page ID #134), and that "[t]he project [would] not contribute to the orderly development of healthcare," *id.* at 6 (Page ID #135).

Those who spoke in favor of TCH's application at the hearing, meanwhile, tended to emphasize the hardship of requiring people seeking methadone treatments to travel dozens of miles away. *See TCH III* R. 31-3 (Tr. of CON Application Hr'g at 26–27, 34–35, 39) (Page ID #1044–45, 1052–53, 1057). Others who were skeptical or opposed questioned the efficacy and safety of methadone when compared against other substitution-based treatments—chiefly a newer synthetic drug called buprenorphine[10]—that were already readily available, *see id.* at 43–

---

[10]Emergent since its approval by the FDA in 2002, buprenorphine (often known by the brand name Suboxone) likewise "prevents . . . withdrawals," "cravings," and "a 'high' from any additional opioid used." Andraka-Christou, *supra*, at 224. "The opioid ingredient in buprenorphine," however, "is significantly less potent than in methadone, so buprenorphine is significantly less likely to be abused and rarely causes an overdose." *Id.* Accordingly, buprenorphine has been characterized by at least some researchers and doctors as a "much safer option," with "significant harm reduction qualities" and very limited risk of overdose. *See* Alan Gordon & Alexandra A. Gordon, *Does It Fit?—A Look at Addiction, Buprenorphine, and the Legislation Trying to Make It Work*, 12 J. HEALTH & BIOMEDICAL L. 1, 10–11 & nn. 50, 54 (2016) (describing comparative safety of buprenorphine and citing sources).

49, 51, 54–56, 59–60, 73–75, 141, 147–48, 168–69, 180–81) (Page ID #1061–67, 1069, 1072–74, 1077–78, 1091–93, 1159, 1165–66, 1186–87, 1198–99), and the quality of the facility that TCH's 50% owner and chief executive, Steven Kester, could be expected to establish, *see id.* at 50–52, 60–70, 79–80, 105–08, 119–23, 130–31, 137–39, 151–53, 166–67, 169–71 (Page ID #1068–70, 1078–88, 1097–98, 1123–26, 1137–41, 1148–49, 1155–57, 1169–71, 1184–85, 1187–89). Two parents, for example, discussed their son's death from a methadone overdose in North Carolina. *Id.* at 75 (Page ID #1093). "[A] board-certified internal medicine physician," medical-school professor, and associate chief of staff at local VA hospital, *id.* at 60–62 (Page ID #1078–80), meanwhile, castigated Kester's track record and summed up his objections bluntly: "Mr. Kester is asking the State to provide a certificate for him to open a pill mill that will hurt far more people than it helps," *id.* at 70 (Page ID #1088).

More spoke against the proposal than spoke for it. Those speaking against the proposal included a person named Jerry Taylor, speaking "on behalf of Johnson City," *id.* at 42 (Page ID #1060), as well as Johnson City's mayor, who was also a practicing oral surgeon, *id.* at 53, 56 (Page ID #1070, 1073). None of the speakers said anything derogatory about people struggling with addiction problems or denied the need for effective treatment of opioid addiction.

On July 8, 2013, approximately two weeks after the HSDA board voted to deny TCH's application, TCH filed *Tri-Cities II*. In addition to raising again its zoning claims against Johnson City from *Tri-Cities I*, TCH this time also sued the HSDA, challenging both the statute governing the CON process and the HSDA's denial of TCH's CON application, which TCH

alleged constituted both intentional discrimination and a failure to make a reasonable modification.[11]  *TCH II* R. 1 (Compl.) (Page ID #3–4, 59–71).

**C.  TCH's Administrative Appeal and *Tri-Cities III***

Later that July, TCH appealed the HSDA's denial of its CON application through the state's administrative process.  *See TCH III* R. 15-12 (Order Revoking Permission at 1) (Page ID #548).  TCH argued that its pending federal lawsuit, however, had the potential to render the state administrative process unnecessary, and so Dunlap asked ALJ Kim Summers (another defendant-appellee here), for a stay, which ALJ Summers granted.  *Id.* at 2 (Page ID #549).  ALJ Summers scheduled conference calls for the parties to check in, and Dunlap requested another stay in September, which ALJ Summers again granted.  *Id.*

On January 8, with another conference call looming, ALJ Summers emailed the parties and asked if there were "any new developments to report."  *TCH III* R. 69-6 (Email Chain) (Page ID #2154).  Dunlap responded:  "No new developments.  Motion for Summary Judgement [sic] and Motions to Dismiss are pending.  I would suggest another 60 day stay in our matter."  *Id.*

The problem, as others saw it, was that there was something to report:  just a few weeks before, the magistrate judge to whom *Tri-Cities II* had been assigned had issued a scathing order, chastising TCH for "a transparent attempt to explain away rather obvious judge-shopping" and an argument that trod "perilously close to being offensive," *TCH III* R. 31-5, Ex. F (Magistrate's Order at 2–4) (Page ID #1293–95), while suggesting that the district court would very likely

---

[11]TCH also raised state-law claims, *TCH II* R. 1 (Compl.) (Page ID #67–70), which are not at issue on appeal.

deem *Tri-Cities II* subject to the same ripeness problems that had felled *Tri-Cities I*, *id.* at 5–6

(Page ID #1296–97). The HSDA's general counsel, Christoffersen, soon emailed ALJ Summers

to dispute Dunlap's account, *TCH III* R. 69-6 (Email Chain) (Page ID #2154), and subsequently

filed a motion to set a hearing in the administrative appeal, attaching the magistrate judge's

order, *see TCH III* R. 31-5 (Motion to Set Hr'g) (Page ID #1226–28, 1292–97).

A few days later, Dunlap filed an objection to the HSDA's motion. *TCH III* R. 15-10

(Objection to Motion to Set Hr'g at 1, 21) (Page ID #521, 541). In its opening section, he wrote:

> In filing its Motion to Set Hearing, HSDA is attempting to make this tribunal the "fixer" by illegally providing HSDA cover in what amounts to its blatant violations of the [ADA]. HSDA is facing a virtually certain loss in federal court . . . for its blatant violations of the ADA . . . . HSDA also faces a pending investigation, and a seemingly imminent enforcement action against it, by the United States Department of Justice. Petitioner suggests that HSDA would love nothing more than to have this tribunal "enter the fight," create a diversion, and take the heat off HSDA and somehow "fix" HSDA's unfixable position. . . .
>
> In addition, if this tribunal does "take HSDA's bait" and takes any action to decide this appeal before a federal court or DOJ has spoken on this case, including scheduling a hearing, Petitioner <u>respectfully</u> indicates that it will have no choice but to join Your Honor, in an official capacity, and this tribunal, as defendants in the pending federal court action.
>
> Finally, Petitioner <u>respectfully</u> submits that, under the ADA, Your Honor and this tribunal are required to offer Petitioner a reasonable modification to allow the CON to be issued. Petition [sic] <u>respectfully</u> submits that Your Honor's and this tribunal's continuing failure to do this creates a cause of action that Petitioner may bring against Your Honor, and the tribunal itself, and may well move DOJ to include Your Honor and this tribunal as respondents in an ADA enforcement action.

*Id.* at 3–4 (Page ID #523–24).

On March 14, 2014, ALJ Summers revoked Dunlap's permission to appear *pro hac vice*.

*TCH III* R. 15-12 (Order Revoking Permission at 1, 4) (Page ID #548, 551). In her order, ALJ

Summers detailed Dunlap's conduct and concluded that his "coercion and misrepresentations are a flagrant attempt to improperly influence a judge in violation of Rules 3.3 [candor], 3.5 [improper influence], and 8.4 [misconduct] of the Tennessee Rules of Professional Conduct, as well as Tenn. Code Ann. § 39-14-112 [extortion]." *Id.* at 10 (Page ID #557).

That revocation prompted TCH's third federal lawsuit, *Tri-Cities Holdings LLC v. Tenn. Admin. Procedures Div. et al.* ("*Tri-Cities III*"), No. 2:14-cv-233, which is the other case in this consolidated appeal (No. 17-5628). In *Tri-Cities III*, TCH named as defendants ALJ Summers, DMHSAS, and a range of related state actors and entities (all of whom are defendants-appellees here). TCH alleged that all involved had violated the ADA and RA by failing to make reasonable modifications, and it alleged further that ALJ Summers and related state entities had violated those statutes by retaliating against Dunlap in revoking his *pro hac vice* admission.[12] *TCH III* R. 1 (Compl.) (Page ID #1, 4, 40–57). The district court stayed that case on October 28 while TCH pressed various appeals. *TCH III* R. 50 (Dist. Ct. Order) (Page ID #1399–1400).

**D. TCH's Appeals and Summary Judgment in the District Court**

None of TCH's appeals was fruitful. The Tennessee Chancery Court affirmed ALJ Summers's revocation of Dunlap's admission. *TCH III* R. 51 (Chancery Ct. Op. at 1, 27) (Page ID #1401, 1427). The Tennessee Court of Appeals affirmed the Chancery Court's ruling, *Tri-Cities Holdings LLC v. Tenn. Health Servs. & Dev. Agency*, No. M2015-00058-COA-R3-CV,

---

[12]TCH also raised federal and state due-process claims that it later dismissed. *TCH III* R. 87 (Notice of Dismissal at 1–2) (Page ID #2462–63). Those claims are thus not at issue here.

2016 WL 721067 (Tenn. Ct. App. Feb. 22, 2016), and the Tennessee Supreme Court denied TCH permission to appeal that affirmance, *TCH III* R. 58 (Order at 1) (Page ID #1592).

Our court, meanwhile, ruled that we lacked jurisdiction to review the denial of TCH's motion for partial summary judgment in *Tri-Cities II*. *Tri-Cities Holdings LLC v. Tenn. Health Servs. & Dev. Agency*, 598 F. App'x 404, 408 (6th Cir. 2015). We also affirmed denial of TCH's motion for a preliminary injunction in that case, noting that the district court had deemed TCH's claims unripe and concluding that TCH had "not shown any error in that conclusion." *Id.*

Ultimately, on August 15, 2016, TCH moved to dismiss its administrative appeal "because it was unable to obtain an extension of its lease option" for its proposed methadone-clinic site and could not find any "other financially viable locations for a clinic." *TCH III* R. 72-2 (Pet.'s Mot. to Dismiss Appeal at 1) (Page ID #2282). Around the same time, the HSDA granted a CON for "a joint venture owned equally by Mountain States Health Alliance and East Tennessee State University Research Foundation" to establish a methadone clinic in the Johnson City area. *TCH II* R. 214-9 (Tr. of MSHA CON Application Hr'g at 8, 82) (Page ID #6057, 6131). The parties agree that this new clinic opened in September 2017. *TCH II* Appellants' Br. at 5 n.4; *TCH II* Johnson City Appellees' Br. at 49.

In October 2016, TCH appeared before the district court in *Tri-Cities II*, at which point the district court addressed a motion by TCH to file a third amended complaint and a motion from a third Jane Doe plaintiff to intervene. R. 251 (Hr'g Tr. at 3, 12) (Page ID #6965, 6974). The district court ultimately denied both motions, and it also lifted stays that been granted in both *Tri-Cities II* and *Tri-Cities III*. R. 205 (Dist. Ct. Order) (Page ID #5447); *TCH III* R. 62

11

(Dist. Ct. Order) (Page ID #1607). The parties then moved for summary judgment in both cases, and the district court granted summary judgment for all defendants in each. *TCH III* R. 86 (Dist. Ct. Op. & Order) (Page ID #2433–34); *TCH II* R. 246 (Dist Ct. Op. & Order at 1–3) (Page ID #6878–80). These now-consolidated appeals followed.

## II. DISCUSSION

On appeal, TCH argues that the following claims of intentional discrimination[13] under the ADA and RA ought to have survived summary judgment: (1) that Johnson City imposed a facially invalid ordinance and sought to exclude methadone clinics, including TCH's proposed clinic, prior to the CON hearing; (2) that Johnson City discriminated against TCH by attempting to prevent it from securing a CON; (3) that the HSDA discriminated against TCH in denying it a CON; (4) that the Tennessee statute requiring methadone clinics to provide special notice to local officeholders is facially discriminatory; (5) that all defendants failed to provide TCH with a reasonable modification of existing policies; and (6) that ALJ Summers and the related Tennessee defendants retaliated against TCH for engaging in protected activity by revoking Dunlap's *pro hac vice* admission. TCH also argues (7) that the district court erred in denying its motion to file a third amended complaint and Jane Doe #3's motion to intervene. For the reasons that follow, we **AFFIRM** the district court on all grounds.

---

[13]TCH also adverts in its briefing to "disparate impact of discrimination." *TCH II* Appellants' Br. at 18. But it did not make this argument below, and we therefore "decline[] to consider on appeal arguments that were not presented to the district court." *Fawkes v. JPMorgan Chase Bank, N.A.*, 645 F. App'x 453, 454 (6th Cir. 2016) (citation omitted).

## A. Standard of Review

"We review de novo a district court's grant of summary judgment." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017). Summary judgment is to be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Williams*, 847 F.3d at 391 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In reviewing the district court's decision to grant summary judgment, we must view all evidence in the light most favorable to the nonmoving party." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## B. The ADA and the RA

"Title II of the ADA mandates that, 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (quoting 42 U.S.C. § 12132). "Section 504 of the Rehabilitation Act provides that '[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc) (quoting 29 U.S.C. § 794(a)). "[T]he

13

two statutes are quite similar in purpose and scope," such that "[t]he analysis of claims under the [ADA] roughly parallels those brought under the [RA]." *Id.* at 459–60 (citation omitted). Where, as here, the "differences in the two statutes are not implicated . . . in the issues presented in [a] case"—or, indeed, raised by the parties at all—"we need not address them." *See id.* at 460.

Under the ADA, the term "public entity" is a broad one: it encompasses "any State or local government," as well as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)–(B). Discrimination by a public entity against a qualified individual "must relate to services, programs, or activities," a definition that we have understood to "encompass[] virtually everything that a public entity does," *Johnson*, 151 F.3d at 569, while noting that it is nevertheless "subject . . . to the bounds of reasonableness," *id.* at 571. Under regulations promulgated by the Attorney General pursuant to Congress's instructions, *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 591 (1999); *see also* 42 U.S.C. § 12134(a), public entities must also "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7)(i).

Claims of intentional discrimination under the ADA follow "the familiar burden-shifting analysis established by [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)]." *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015) (punctuation omitted) (quoting *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006)). As we have explained:

14

> To establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability. In other words, the plaintiff must show that the defendant took action because of the plaintiff's disability, i.e., the plaintiff must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive. Further, the plaintiff must show that the discrimination was *intentionally* directed toward him or her in particular.

*Id.* at 357 (footnote, citations, and quotation marks omitted). "Once a plaintiff establishes a prima facie case of discrimination, the defendant 'must then offer a legitimate, nondiscriminatory reason for its' challenged action." *Id.* (quoting *Sjostrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014)). If the defendant produces such an explanation, the plaintiff "must then present evidence allowing a jury to find that the [defendant's] explanation is a pretext for unlawful discrimination." *Id.* (quoting *Sjostrand*, 750 F.3d at 599).

## C. Issue 1: Issue Preclusion and the *Tri-Cities I* Claims

The first cluster of claims on which TCH appeals matches its claims from *Tri-Cities I*: essentially, that Johnson City's zoning regulations in effect at the time of its CON application were facially discriminatory and reflected a broader effort by Johnson City to exclude TCH (and other, similar facilities) from its city limits. *See TCH II* Appellants' Br. at 2–3, 6–7, 20–22. Johnson City argues (as the district court held) that the legal question of whether these claims are ripe for adjudication is subject to issue preclusion based on *Tri-Cities I*. *See TCH II* Johnson City Appellees' Br. at 11–12; *TCH II* R. 246 (Dist. Ct. Op. & Order at 1-15) (Page ID #6878–92). Inexplicably, TCH barely mentions the district court's issue-preclusion ruling and offers

essentially no legal argument as to why issue preclusion does not apply. *See TCH II* Appellants'

Br. at 22–23 (providing eight conclusory lines of text and citing one opinion as authority).

As we have repeatedly made clear, "addressing an issue on appeal 'requires developed argument;

a party is required to do more than advert to an issue in a perfunctory manner.'" *Puckett v.*

*Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 611 (6th Cir. 2016) (quoting *Bolden v. City*

*of Euclid*, 595 F. App'x 464, 468 (6th Cir. 2014)); *see also, e.g.*, *Gerboc v. ContextLogic, Inc.*,

867 F.3d 675, 681–82 (6th Cir. 2017). TCH's argument is indeed so perfunctory and

undeveloped as to be forfeited.

> Regardless, however, Johnson City has the better of the dispute. As we have explained:
>
> Issue preclusion, often referred to as collateral estoppel, "precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action." Four requirements must be met before issue preclusion applies: "(1) the precise issue must have been raised and actually litigated in the prior proceedings; (2) the determination of the issue must have been necessary to the outcome of the prior proceedings; (3) the prior proceedings must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding."

*Georgia-Pac. Consumer Prod. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir.

2012) (citations omitted). Here, the question of whether TCH's claims against Johnson City's

zoning regulations and allegedly exclusionary posture toward methadone clinics were ripe was

clearly litigated during *Tri-Cities I*, and the resolution of that question was necessary to (indeed,

determined) the outcome of that case. *See TCH II* R. 19-1 (*Tri-Cities I* Dist. Ct. Op. & Order)

(Page ID #456–65). Those proceedings resulted in a final judgment dismissing the action on the

16

merits, *TCH II* R. 19-2 (*Tri-Cities I* J.) (Page ID #467), which TCH could have appealed but did not. *See Robert N. Clemens Tr. v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 845–46 (6th Cir. 2007) (explaining that dismissal of an *action* constitutes a final and appealable order, in contrast to dismissal only of a *complaint*, which would present only an opportunity to amend and refile). And TCH had "a full and fair opportunity to litigate the issue," *Georgia-Pac. Consumer Prod.*, 701 F.3d at 1098, in *Tri-Cities I*. Issue preclusion applies.

**D. Issue 2: Johnson City's Effect on the CON Process**

TCH also argues that the district court erred in granting summary judgment on TCH's claims that Johnson City violated the ADA and RA by seeking to prevent TCH from obtaining a CON, both at the CON hearing itself and by withholding zoning approval. *See, e.g.*, *TCH II* Appellants' Br. at 2, 9, 11–12, 17–18. Though logically distinct from those governed by the district court's prior ripeness determination in *Tri-Cities I*, and thus not subject to issue preclusion, TCH has arguably forfeited these arguments by failing to raise them in its complaints. But even assuming for the sake of argument that TCH properly presented its arguments to the district court through its pleadings at the summary-judgment stage, *see Vencor, Inc. v. Standard Life & Acc. Ins. Co.*, 317 F.3d 629, 641 n.11 (6th Cir. 2003); *TCH II*, R. 213 (Pls.' Mem. in Support of Motion for Summary J. at 8–11) (Page ID #5518–21), summary judgment was proper on the merits. That is because, to succeed in its intentional discrimination claims, TCH must first (among other requirements) "present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers

17

themselves or by those to whom the decision-makers were knowingly responsive." *Anderson*, 798 F.3d at 357 (quoting *Turner*, 195 F. App'x at 353). It has not met this bar.

For one, Johnson City had a right under state law to participate in the CON hearing. *See* Tenn. Code Ann. § 68-11-1624 (making clear that "a local governing body" may "participate in" a CON hearing "and express support or opposition to the granting of a certificate of need to the applicant"). The ADA, of course, trumps state law, *see* U.S. CONST. art. VI, cl. 2, and whether such a rule itself violates the ADA is a separate question implicated below. But TCH's suggestion that Johnson City manifested animus by showing up to offer its opinion is clearly vitiated by the fact that Johnson City was invited by statute to do exactly that.

TCH also maintains that Johnson City's expression of these views violated the "integration mandate" of *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). *TCH II* Appellants' Br. at 11. But this authority does little to support TCH's case. After all, *Olmstead* does not require that a locality support every single application for necessary permits by a corporation seeking to serve disabled persons. Rather, it simply holds that "placement of persons with mental disabilities in community settings rather than in institutions" is required under the ADA "when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead*, 527 U.S. at 587. TCH has not put forward nearly enough evidence to create a genuine issue of material fact as to whether Johnson City has run afoul of that more nuanced rule.

18

Meanwhile, TCH's argument that "state entities enjoy no Free Speech Clause Rights," *see TCH II* Appellants' Br. at 18, is at best highly misleading, as even the portion of a Supreme Court opinion that TCH cites makes clear. *See Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139 & n.7 (1973) (Stewart, J., concurring); *see also Walker v. Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2246 (2015) ("[A]s a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position."); *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("A government entity has the right to 'speak for itself.'" (citation omitted)). Johnson City does not have a right to discriminate, to be sure, but it did have a right to express its nondiscriminatory views.

Nor does Johnson City's zoning ordinance appear to have been intended to affect (nor does it appear to have affected) TCH's CON application itself. As noted above, Christoffersen urged HSDA board members not to take zoning into account in determining their votes, *TCH III* R. 31-3 (Tr. of CON Application Hr'g at 8) (Page ID #1026), and there is no evidence in the record to the contrary. Similarly, TCH's claim that "TDMHSAS issued a negative report that TCH had only 'possibly established economic feasibility,' in part because Johnson City had refused TCH zoning approval based on its discriminatory zoning ordinance," *TCH II* Appellants' Br. at 9 (quoting *TCH II* R. 214-4 (Review of CON Application at 5–7) (Page ID #6012–14)), is at best highly confused. First of all, "economic feasibility" was TCH's *best* score in the DMHSAS report: DMHSAS rated that factor "possibly . . . established," whereas it found both need and "contribut[ion] to the orderly development of healthcare" lacking. *See TCH II* R. 214-4 (Review of CON Application at 5–7) (Page ID #6012–14). So it is odd for TCH to suggest that

19

any harm to its economic-feasibility rating made a difference, when two other factors that it neglects to mention revealed bigger red flags. But even more importantly, the reason that DMHSAS found TCH's economic feasibility only *possibly* established was not because of zoning, but rather because TCH's application was missing "requested documentation." *Id.* at 5 (Page ID #6012). And while the DMHSAS report *does* mention the zoning issue under "orderly development of healthcare," all that it observes there is that TCH has not yet "provide[d] a current letter from the City of Johnson City that the proposed site meets zoning requirements" and that "the Applicant has requested zoning variances." *Id.* at 7 (Page ID #6014). While doing so, the report also notes a bevy of other problems, including TCH's lack of "existing agreements and affiliations," its lack of "letters of support" from "local universities and professional societies," the lack of information about whether it can meet its proposed "staffing requirements," and the lack of clarity from its responses as to "whether [TCH] is fully aware of and understands the complexity of all federal, Tennessee, and local laws, regulations, rules, and ordinances" involved in its undertaking. *Id.* at 6–7 (Page ID #6013–14). In short, the report does not help TCH's case.

Perhaps most importantly, the record of the CON hearing itself does not disclose the "wide-spread community animus," *TCH III* Appellants' Br. at 12, against opioid-addicted persons that TCH claims. Such cases certainly do exist: in *MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002), for example, we affirmed a judgment for a methadone clinic after it had its zoning permit revoked following substantial and suspicious public opposition— including an assistant police chief testifying, without supporting evidence, about supposed crime

risks associated with methadone clinics, *id.* at 329–30—and where, after that, the city passed a zoning amendment that "completely foreclosed" the clinic's "opportunity to locate in the city," *id.* at 331. But that is not this case. Instead, as is already clear, the record here is devoid of animus against people struggling with addiction, and instead principally reflects two kinds of permissible skepticism unrelated to disability: first, skepticism that methadone is better than buprenorphine (which was already plentifully available), and second, skepticism about Kester and the type of operation that he was likely to lead.[14] We express no view on whether either vein of skepticism was ultimately correct; what matters is that there is no evidence that either was motivated by (or, for that matter, used to conceal) animus against the protected group.[15]

TCH seeks to avoid this conclusion by picking out two quotes from the hearing that, divorced from context, understandably give pause. The first quote is an HSDA board member's having characterized Johnson City's response as "staunch opposition in this particular area to this kind of treatment." *See TCH III* R. 31-3 (Tr. of CON Application Hr'g at 186) (Page ID #1204). But closer inspection belies the significance that TCH ascribes to this quote. For one, the quote clearly refers to an apparent preference for a *different* kind of treatment— buprenorphine—which, as already discussed, is hardly a smoking gun for animus. And

---

[14]Kester himself seems to have recognized this trend in the testimony. *See TCH III* R. 31-3 (Tr. of CON Application Hr'g at 174) (Page ID #174) (stating that he had refrained from defending himself against charges of "being a terrible, rotten person and a terrible, rotten operator").

[15]The former strain of skepticism, we note, is at least empirically justifiable. *See* Andraka-Christou, *supra*, at 221, 224; Gordon & Gordon, *supra*, at 10–11 & nn. 50, 54; *Risk for Overdose*, *supra*, at 493–94. And the latter is at least consistent with the fact that there now *is*, as TCH acknowledges, a methadone clinic in the Johnson City area. *See TCH II* R. 214-9 (Tr. of MSHA CON Application Hr'g at 82) (Page ID #6131); *TCH II* Appellants' Br. at 5 n.4.

moreover, TCH's quotation omits the end of the sentence, which, reproduced in full, reads: "I see it really as a staunch opposition in this particular area to this kind of treatment, and also, obviously, opposition to the provider themselves." *Id.* at 186 (Page ID #1204). As likewise discussed, the record amply supports the accuracy of this second clause.

The other snippet that TCH carves out is even more misleading. "At the CON hearing," TCH states in its brief, "a *Johnson City Press* news story was read aloud quoting a Johnson City Commissioner, saying 'We want the applicant to get the message methadone clinics are not welcome in Johnson City.'" *TCH II* Appellants' Br. at 10; *TCH III* Appellants' Br. at 12. If this were in fact telling evidence, there might well be a genuine dispute of material fact. But, for one, the full quote makes clear that the news story in question was more than a decade old and unrelated to the CON application at issue. *See TCH III* R. 31-3 (Tr. of CON Application Hr'g at 84–85) (Page ID #1102–03). Second, the attendee who chose to read this outdated and largely irrelevant quote into the record was not a city participant or disinterested onlooker, but rather Kester himself. *Id.* A plaintiff (or, in this case, its agent and partial owner) cannot avert summary judgment by "manufactur[ing] a genuine issue of material fact" in this way. *See Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 420 (6th Cir. 2004). This claim fails.

## E. Issue 3: The HSDA's Denial of a CON

In light of the foregoing, the question of whether the HSDA violated the ADA in denying TCH's CON application can be dealt with more briefly. The public benefit that TCH sought here was a CON. In making available a public benefit, like a CON, state actors are not required to ensure that each applicant accrues purely "equal results from the provision of the benefit."

*See Jones v. City of Monroe*, 341 F.3d 474, 479 (6th Cir. 2003); *see also Alexander v. Choate*, 469 U.S. 287, 302–03 (1985). Rather, as noted above, it is TCH's burden to "present evidence that animus against the protected group was a significant factor in the" board's decision to withhold a CON. *See Anderson*, 798 F.3d at 357 (quoting *Turner*, 195 F. App'x at 353).

As the preceding discussion helps make clear, TCH has failed to present such evidence. None of the participants in the CON meeting, let alone any of the HSDA board members, expressed animus against disabled persons or the entities that serve them. Rather, as already discussed, the participants primarily expressed skepticism about methadone as a treatment as compared against *other* types of already-available treatments (chiefly buprenorphine), and skepticism about Kester and his business model. Nor does the DMHSAS report on which the board relied reveal any discriminatory animus, but rather a sober, lengthy analysis of the relevant, statutorily prescribed factors. *See* Tenn. Code Ann. §§ 68-11-1608(a), -1609(b), -1614; *TCH III* R. 15-1 (Review of CON Application) (Page ID #130–47).

TCH's allegations of discriminatory intent on HSDA's part are also difficult to square with Kester's own declaration that other, similar clinics had received CONs and were "operating in other parts of Tennessee," *TCH II* R. 46 (Kester Decl. at 3 ¶ 16) (Page ID #3010), as well as with the HSDA's having granted a CON for a methadone clinic in the Johnson City area specifically, *TCH II* R. 214-9 (Tr. of MSHA CON Application Hr'g at 8, 82) (Page ID #6057, 6131). All of which makes sense, given that the HSDA is a statewide board, quite possibly created to avoid the not-in-my-backyard-type dangers that more local review could conceivably invite.

23

Even if TCH could make out a prima facie case, it would fail at step three of the *McDonnell Douglas* framework for the reasons just discussed. The reasons provided by the DMHSAS and the HSDA members plainly qualify as "legitimate" and "nondiscriminatory," and TCH has wholly failed to "present evidence allowing a jury to find that the [defendants'] explanation is a pretext for unlawful discrimination." *See Anderson*, 798 F.3d at 357 (quoting *Sjostrand*, 750 F.3d at 599). Summary judgment was correct here too.

**F. Issue 4: The Tennessee Notice Rule**

TCH also appeals the district court's grant of summary judgment against its claims that Tenn. Code Ann. § 68-11-1607(c)(9)(A)—the "Notice Rule" formerly codified at § 68-11-1607(c)(3)—violates the ADA and RA. *See TCH II* Appellants' Br. at 14–15. TCH argues that this requirement burdens "applicants serving the disabled" (here, people addicted to opioids) and "operates to galvanize local opposition to treatment for the disabled." *Id.* at 6. The HSDA argues instead that, as the district court held, the statute does "not impose any burden . . . [that] would, in any way, disadvantage TCH in receiving a CON," *TCH II* HSDA Appellees' Br. at 17 (quoting R. 246 (Dist. Ct. Op. & Order at 23) (Page ID #6900)), and that nothing in the "current" or "historical record" shows that the notice requirement generates the kind of vociferous opposition that TCH asserts, *TCH II* HSDA Appellees' Br. at 18–19.

Though it is a close case, we think that summary judgment was proper. To establish a prima facie case, TCH must present evidence that disabled persons were "excluded from participation in, denied the benefits of, or subjected to discrimination" by the statute. *See Anderson*, 798 F.3d at 357. The scope of these protections is broad, but it is also "subject . . . to

24

the bounds of reasonableness." *Johnson*, 151 F.3d at 571. We have accordingly ruled in the past that a plaintiff lacked grounds for a claim under the ADA where any harm asserted was truly de minimis. *See Robinson v. Corr. Corp. of Am.*, 14 F. App'x 382, 383 (6th Cir. 2001).

This is a low bar, but it is one that TCH has failed to meet given the evidence that it has offered here. The notice requirement does not add cognizably to the burdens that all CON applicants face, given that nothing but bare notice is required, *see* Tenn. Code Ann. §68-11-1607(9)(A), and all applicants must file "letter[s] of intent" and then publish these letters "in a newspaper of general circulation in the proposed service area of the project" anyway, *id.* § 68-11-1607(c)(1). Any additional burden, in other words, appears to be so vanishingly small that we cannot say that there was, in fact, any kind of exclusion, deprivation, or discrimination.

In so deciding, we pause to note how limited our ruling here is. After all, classifications that appear to treat people with disabilities differently raise serious concerns under the ADA and RA. *See* 42 U.S.C. § 12132; *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 287 (1987) (noting the RA's "goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear"). Were the differences here more extreme, summary judgment could well be inappropriate. *Cf. New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 304–05 (3d Cir. 2007) (ruling that zoning law seriously restricting placement of methadone clinics violates ADA); *MX Grp.*, 293 F.3d at 345 (agreeing that a "blanket prohibition of all methadone clinics from [an] entire city is discriminatory on its face"); *Potomac Grp. Home Corp. v. Montgomery Cty.*, 823 F. Supp. 1285, 1296 (D. Md. 1993) (deeming facially invalid, under the Fair Housing Amendments Act, a notice requirement directing any "prospective

25

provider of group home services to the elderly" both to "notify neighbors and civic organizations" about future disabled residents and to "invite [those] neighbors to comment").

Moreover, our ruling is especially narrow because TCH has failed to present any evidence that the notice provision at issue did or generally does operate to generate opprobrium. While it is conceivable that such a provision could operate to generate discriminatory opposition, the record *here* is devoid of any such evidence. And uncontroverted evidence in the record actually indicates that TCH's assertions are "not supported by the historical record," which instead "reveals instances in which public officials neither supported nor opposed such applications," and "at least two . . . applications [that] were supported by elected public officials to whom the applicants were required to provide notice." R. 90 (Hill Decl. at 3 ¶ 7) (Page ID #3407). On the record that TCH developed here, with all justifiable inferences made in TCH's favor, we affirm the district court's grant of summary judgment.

## G. Issue 5: Failure to Make a Reasonable Modification

TCH also appeals the district court's rejection of TCH's argument that it was denied reasonable modifications of existing policies that would have enabled its CON application to be granted. *See TCH II* Appellants' Br. at 25–27; *TCH III* Appellants' Br. at 16. It levels this argument in essentially every possible direction: at Johnson City for not modifying its zoning regulations; at the HSDA for not modifying its application of the CON criteria; at DMHSAS for not modifying its interpretation of the CON criteria; and even at ALJ Summers (and related state defendants) for not modifying her adjudication of TCH's claims. TCH also argues that these

various defendants impermissibly failed to provide an explanation of why such a modification was not required. *See TCH II* Appellants' Br. at 27; *TCH III* Appellants' Br. at 17–22.

The Johnson City branch of this multidirectional claim can be dealt with quickly, in that it is not analytically distinct from the issues already deemed unripe (and then not appealed) in *Tri-Cities I*. *See TCH II* R. 19-1 (*Tri-Cities I* Dist. Ct. Op. & Order) (Page ID #456–65). Because that prior determination has issue preclusive effect, this branch of TCH's claim fails.

TCH's claims against DMHSAS and ALJ Summers can also be dealt with fairly quickly. As noted above, discrimination by a public entity against a qualified individual "must relate to services, programs, or activities." *Johnson*, 151 F.3d at 569. While we have understood that "phrase" to "encompass[] virtually everything that a public entity does," *id.*, it does not cover everything that is in any way *related to* a given government function, because the requirement itself is "subject . . . to the bounds of reasonableness." *See id.* at 571. Thus, the scope of a benefit cannot be so "amorphous" as to sweep in protection against all possible outcomes, *see Choate*, 469 U.S. at 303, or liability for all possible government actors, *cf. Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F. Supp. 2d 460, 485 (D.N.J. 1998) (noting that "it would be odd to saddle someone with liability for a certain discriminatory condition . . . when it is not that person who manages, controls, or regulates . . . that particular condition" and questioning "what relief could [even] be obtained from someone who has no power to effect a remedy for the violation").

Here, DMHSAS and ALJ Summers are not responsible for granting or denying CON applications. Rather, they are responsible, respectively, for preparing a report for the HSDA that checks a CON application's claims and evaluates that application in light of statutorily

determined factors, *see* Tenn. Code Ann. §§ 68-11-1608(a), -1609(b), -1614; *TCH III* R. 15-1 (Review of CON Application) (Page ID #130–47), and for adjudicating contested CON application decisions, *see* Tenn. Code Ann. § 68-11-1610. While these defendants were certainly required to discharge *those* responsibilities in a nondiscriminatory fashion, they were not in charge of the CON application program itself. As a matter of law, therefore, they were not responsible for providing a reasonable modification to that program.[16]

That leaves the HSDA itself, which *is* responsible for granting or denying CON applications. As noted above, public entities must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i); *see also, e.g.*, *Jones*, 341 F.3d at 480. "The public entity bears the burden of proving that the accommodation would fundamentally alter the program."[17] *Jones*, 341 F.3d at 480.

"In cases involving waiver of applicable rules and regulations, the overall focus should be on 'whether waiver of the rule in the particular case would be so at odds with the purposes

---

[16]ALJ Summers is also, as the state defendants note, *TCH III* Appellees' Br. at 20 n.12, absolved of any damages for another reason: judicial immunity. *See Mireles v. Waco*, 502 U.S. 9, 11–12 (1991); *Dixon v. Clem*, 492 F.3d 665, 674 (6th Cir. 2007).

[17]TCH's argument that the state defendants have run afoul of this rule by failing to offer "specific facts showing any costs of a modification or their rules," *TCH II* Appellants' Br. at 28, misunderstands what we have required of defendants. It is true, to be sure, that a district court errs if, *at a pre-discovery stage*, it "merely accept[s] [a] defendant's affirmative defense without requiring facts and evidence to support it." *Hindel v. Husted*, 875 F.3d 344, 347–48 (6th Cir. 2017). But here at summary judgment we have a more-than-ample record to which to refer, particularly given that the question of whether the HSDA should be required to adjust the CON criteria is more abstract than a "typically fact-based" case. *See id.* at 347.

behind the rule that it would be a fundamental and unreasonable change.'" *Id.* (quoting *Dadian v. Village of Wilmette*, 269 F.3d 831, 838–39 (7th Cir. 2001)). Accordingly, in a case in which a city had provided free "all-day and one-hour parking in specific locations" to encourage "downtown shopping and other downtown business activities," *id.* at 477–78, we ruled that a resident with a disability was not denied a reasonable modification when the city declined to allow her to park all day at one of the one-hour spots near her office, *id.* 480. That was because, we explained, "[b]y its very nature, the benefit of one-hour free public parking cannot be altered to permit disabled individuals to park all day without jeopardizing the availability of spaces to other disabled and nondisabled individuals," which would in turn vitiate "the rule itself." *Id.*

This logic applies with stronger force here. As directed by the Tennessee legislature, the HSDA is responsible for applying neutral criteria to determine whether a given applicant is qualified to operate its proposed facility. *See* Tenn. Code Ann. § 68-11-1609. By their very nature, neither these criteria nor their application can be altered to provide a waiver to TCH without jeopardizing Tennessee's interest in ensuring that healthcare institutions meet the non-discriminatory qualifications that its legislators and regulators have set. To require the HSDA or the state itself to give up its interest in ensuring that those qualifications are met by each aspiring provider would surely impose a fundamental alteration. *See Jones*, 341 F.3d at 480.

Moreover, waiver is especially likely to impose a fundamental alteration when the question of whether to grant such a waiver would require complex, "case-by-case assessments." *See McPherson*, 119 F.3d at 462; *see also Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1035 (6th Cir. 1995). Thus, where nineteen-year-old students with learning

disabilities sought waiver of the state high school athletic association's age requirement, *Sandison*, 64 F.3d at 1028, we reasoned that waiver of the age requirement would "fundamentally alter[]" that rule by vitiating its ability to ensure fair competition, *id.* at 1035. Referencing the possibility that there would be no fundamental alteration because the plaintiffs were not "were not 'star' players," *id.* at 1029, we reasoned that it would be "an undue burden" to ask an athletic association to assess whether a particular candidate's "average athletic skills . . . would . . . fundamentally alter the program," given the number of complex variables involved. *Id.* at 1035. "It is unreasonable," we explained, "to call upon coaches and physicians to make these near-impossible determinations." *Id.*; *see also McPherson*, 119 F.3d at 462.

Again, the logic of those precedents applies with stronger force here. The HSDA is not only responsible for deciding whether TCH qualifies for a CON, but also for deciding whether a host of applicants across the State of Tennessee qualify for CONs. Even if TCH, as it has steadfastly maintained, is worthy of a CON in some abstract sense that could be honored by adjusting the CON criteria, TCH offers no answer to how the HSDA ought to determine which CON applicants deserve to have the CON criteria adjusted in their favor and which do not. "It is unreasonable to call upon [the HSDA] to make these near-impossible determinations." *Sandison*, 64 F.3d at 1035. We affirm summary judgment on this set of issues as well.

**H. Issue 6: Retaliation for Engaging in Protected Activity**

TCH presses one more charge under the ADA and RA on appeal: that ALJ Summers retaliated in violation of these statutes[18] by revoking Dunlap's *pro hac vice* admission. *TCH III* Appellants' Br. at 26–29. The state defendants argue that the district court was correct to grant summary judgment to them for two independently sufficient reasons: first, because the issue of what caused the revocation is subject to preclusion based on TCH's prior litigation in state court, and second, because TCH cannot establish sufficient proof that TCH's engaging in protected activity motivated ALJ Summers's adverse action. *TCH III* Appellees' Br. at 24–29.

We need not decide whether issue preclusion resolves this claim in its entirety; even if it does not, TCH has failed to provide sufficient proof of retaliatory motive. "Retaliation claims are also analyzed under the *McDonnell Douglas* framework where, as here, there is no direct evidence of retaliation." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017). As we have explained in an analogous context:

> The initial burden falls on Plaintiffs to present a prima facie case of retaliation. That requires them to establish that: (1) they engaged in activity protected under Section 504 and the ADA; (2) [the defendants] knew of this protected activity; (3) [the defendants] then took adverse action against Plaintiffs; and (4) there was a causal connection between the protected activity and the adverse action. "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met."

*A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)) (citations omitted). "If the plaintiff does

---

[18]As with TCH's preceding claims, in the absence of any argument against so doing and in keeping with precedent, we analyze TCH's retaliation claims under the ADA and RA in tandem. *See A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 696–97 (6th Cir. 2013).

so, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse . . . action. The plaintiff must then show that the reason given . . . was actually a pretext designed to mask retaliation." *Williams*, 847 F.3d at 396 (citation omitted). "To establish pretext, a plaintiff must demonstrate '*both* that the [defendant's] proffered reason was not the real reason for its action, *and* that the [defendant's] real reason was unlawful.'" *Id.* (quoting *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc)).

Regardless of whether TCH could make out a prima facie case, TCH cannot satisfy step three of this analysis. At step two, the state defendants can clearly put forward a legitimate, nondiscriminatory reason for Dunlap's expulsion: Dunlap's unprofessional behavior. That, after all, was ALJ Summers's stated reason for revoking Dunlap's *pro hac vice* admission—that his "coercion and misrepresentations" violated three Tennessee Rules of Professional Conduct as well as, in her view, the Tennessee extortion statute. *See TCH III* R. 15-12 (Order Revoking Permission to Appear *Pro Hac Vice* at 10) (Page ID #557). And the Tennessee Court of Appeals ratified her conclusion regarding the three Tennessee Rules (while expressing no opinion on the extortion statute), deeming ALJ Summers's decision "reasonable" and "consistent with a proper application of the controlling legal principles." *Tri-Cities Holdings, LLC v. Tenn. Health Servs. & Dev. Agency*, No. M2015-00058-COA-R3-CV, 2016 WL 721067, at *10 (Tenn. Ct. App. Feb. 22, 2016) (citation omitted), *appeal denied* (June 23, 2016). There is no cause to doubt this conclusion in light of the record, and, in any event, the Tennessee Court of Appeals's ruling that ALJ Summers's conclusions were *reasonable* does have issue-preclusive effect. *See Georgia-Pac. Consumer Prod.*, 701 F.3d at 1098. So TCH must show that this legitimate,

nondiscriminatory reason "was not the real reason for [ALJ Summers's] action, *and* that [her] real reason was" Dunlap's pressing ADA and RA claims. *See Ford Motor Co.*, 782 F.3d at 767.

Though plaintiffs can rely on "temporal proximity" to meet their "causal burden" at the prima facie stage, *see, e.g.*, *A.C. ex rel. J.C.*, 711 F.3d at 699, "temporal proximity cannot be the sole basis for finding pretext," *Ford Motor Co.*, 782 F.3d at 767 (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)). In other words, TCH must point to at least *some* other evidence that Dunlap's violations of the Tennessee Rules of Professional Conduct were "not the real reason that" ALJ Summers revoked his *pro hac vice* admission, "and that unlawful retaliation" for Dunlap's pressing ADA claims "in fact was." *See id.*

TCH has failed to do so. TCH rests its case essentially on one piece of ALJ Summers's justification: that Dunlap's behavior amounted to extortion in violation of Tenn. Code Ann. § 39-14-112. *See TCH III* Appellants' Br. at 26. This statement by ALJ Summers indeed appears to have been overreaction, as the Tennessee appellate court's decision seems to suggest by negative inference. But the question here is not whether *one* of ALJ Summers's justifications was an overreaction, but rather whether ALJ Summers's explanation as a whole was mere pretext to conceal a retaliatory motive. *See, e.g.*, *Bryson v. Regis Corp.*, 498 F.3d 561, 572 (6th Cir. 2007). Because TCH has failed to provide any other evidence that ALJ Summers's revocation of Dunlap's admission had anything to do with retaliatory animus, summary judgment was proper.

**I. Issue 7:  TCH's Motion to File a Third Amended Complaint and Jane Doe #3's Motion to Intervene**

That leaves one final set of procedural questions:  was the district court wrong to deny TCH's motion to file a third amended complaint and Jane Doe #3's motion to intervene?  In one conclusory paragraph, TCH says yes, citing only Federal Rule of Civil Procedure 15(a)(2). "This perfunctory attempt at argument waives this claim." *Gerboc*, 867 F.3d at 681–82.

## III.  CONCLUSION

The opioid-addiction crisis in the United States is serious, as are the mandates of the ADA and RA.  Fortunately, despite TCH's claims to the contrary, the record in this case does not indicate a lack of seriousness on the various defendants' part with regard to either, particularly in light of Johnson City's revisions to its zoning code and the recent opening of a methadone clinic in the area.  Instead, the record reveals permissible skepticism with regard to TCH's proposed methods and with regard to TCH's leadership.  We **AFFIRM** the district court's grant of summary judgment to all defendants.